845 So.2d 1249 (2003)
STATE of Louisiana
v.
Leon SIMMONS.
No. 03-KA-20.
Court of Appeal of Louisiana, Fifth Circuit.
April 29, 2003.
*1251 Paul D. Connick, Jr., District Attorney, Twenty-Fourth Judicial District Court, Parish of Jefferson, Terry M. Boudreaux, Assistant District Attorney, Gretna, LA, for Appellee, State of Louisiana.
Margaret S. Sollars, Louisiana Appellate Project, Thibodaux, LA, for Appellant, Leon Simmons.
Panel composed of Judges JAMES L. CANNELLA, THOMAS F. DALEY, and SUSAN M. CHEHARDY.
SUSAN M. CHEHARDY, Judge.
On June 22, 1995, the Jefferson Parish Grand Jury indicted defendant, Leon Simmons, on one count of aggravated rape, in violation of La. R.S. 14:42, and one count of aggravated crime against nature, in violation of La. R.S. 14:89.1. On September 25, 1995, defendant was arraigned and pled not guilty.
After a two-day trial which commenced on April 15, 1997, the twelve-member jury found defendant guilty as charged on both counts. On July 15, 1997, after denying defendant's Motion for Post Verdict Judgment of Acquittal, the trial judge sentenced defendant to life imprisonment for aggravated rape and 15 years for aggravated crime against nature to run concurrently. The sentences were imposed without benefit of parole, probation, or suspension of sentence.
On December 12, 1997, defendant filed an untimely Motion for New Trial, which was subsequently denied. That same day, defendant also filed a Motion for Appeal, which was granted on October 22, 1999, almost two years after the motion was filed. On October 31, 2000, this Court dismissed defendant's appeal as untimely and remanded the case to the district court with instructions to grant defendant an "out of time" appeal. State v. Simmons, 00-286 (La.App. 5 Cir. 10/31/00)(not designated for publication). On December 30, 2002, the trial judge granted defendant's out-of-time appeal.

Facts
In May of 1995, T.S.[1], who was five-years-old at the time, lived with her mother, her younger sister, her younger brother, her uncle and her grandmother in a house on Lincoln Avenue in Marrero, Louisiana. On the afternoon of May 12, 1995, she, her siblings, and her mother were taking a nap in the den of their home. The defendant, who lived in a car in front of the victim's house, was mowing the lawn at the victim's grandmother's request. Before they laid down for their nap, the victim's mother checked to see if the defendant needed a glass of water but he told her that he did not need anything.
The victim's mother testified that, although defendant did chores for her family *1252 sometimes, he was not allowed inside of the house. At some point that afternoon, however, the defendant, known in the neighborhood as "Bubby," knocked on the window and the victim's younger sister, who was three-years-old at that time, let him into the house.
When the victim got up to go to the bathroom, the defendant followed her into the bathroom and removed his clothes. According to the victim, the defendant put his "thing" into her mouth and "put it down there." She remembered that she screamed but "Bubby" told her to stop screaming. Then, defendant took her into an unoccupied bedroom, removed her underwear, laid her on the bed, and put his "thing" in her mouth and "down there." The victim said it "hurt bad" and that he hurt her "down there" with his "thing." T.S. said her mouth and "down there" were not wet, but dry after these incidents.
She later stated that his "thing" was his "private" and pointed to her vagina to explain "down there." The defendant also told her not to tell anyone what had happened.
That night after dinner and the children's baths, the victim's mother noticed that T.S. was "picking" at her bottom and "digging at her private." When her mother asked about her behavior, the victim told her, "Bubby did me here." After a brief search for defendant, the victim's mother called the police.
In response to the report, Detective Michael Carrone of the Personal Violence Unit of the Jefferson Parish Sheriff's Office went to the victim's house to investigate. There, the victim recounted the incident for Detective Carrone and identified "Bubby" as the perpetrator.
After T.S. gave her statement to Detective Carrone, she and her mother were taken to Lakeside Hospital. There, she was examined by Dr. Scott Benton, who is an expert in general pediatric medicine and child abuse. During their initial interview, T.S. identified "Bubby" as the man that raped her.
After their interview, Dr. Benton performed a physical examination, which included collecting evidence for a rape kit, taking photographs of the victim's genital area with a specialized medical camera, conducting a dye test to reveal abrasions on her genitalia, and taking a second set of photographs of the genital area after the dye test. Dr. Benton testified that his examination of the victim revealed injuries, which are indicative of recent, blunt penetration trauma.
On May 16, 1995, Detective Carrone took the victim and her mother to the Jefferson Parish Children's Advocacy Center, where the victim met with Omalle Gordon, an employee of the Gretna Police Department assigned to the Children's Advocacy Center. During a videotaped interview with Ms. Gordon, the victim again identified "Bubby" as the perpetrator. Based on the sum of the information that he had received, Detective Carrone swore out a warrant for defendant's arrest.
After defendant was arrested, the matter proceeded to trial. At trial, the State presented testimony from Detective Carrone, Omalle Gordon, Dr. Benton, and the victim's mother. T.S.'s mother stated that on the day in question, she did not see defendant in their house nor hear T.S. scream. She also stated that after that day, the victim had nightmares, would not play, and would not talk. The jury also viewed the videotaped interview of the victim conducted at the Children's Advocacy Center.
*1253 At trial, the defendant called several witnesses, including the victim. He also testified on his own behalf. Because of her young age and the potential emotional distress, T.S. was allowed to testify via closed circuit television. She testified that her younger sister let "Bubby," who knocked on the window, into the house while her family was sleeping in the den. He followed her into the bathroom and removed his clothes. He told her to stop screaming when she screamed loudly. She testified that the incident happened in her "mama's room."
The defendant also called Darrell Manuel, who testified that he and the defendant worked from 10:00 a.m. until 4:00 p.m. cutting down a tree for Darrell's mother on May 12, 1995. He also stated that his mother's house was at most four blocks from T.S.'s street. Defendant used Darrell's mother's lawnmower to cut lawns in the neighborhood.
On cross examination, Darrell admitted that, after the incident, defendant told him, in reference to an unidentified person, that the "p was good." When asked to clarify, Darrell stated that defendant said that the "p___y was good." Darrell thought defendant was referring to T.S.'s mother since defendant had "just got finished cutting grass from down [T.S.'s] street." Darrell also admitted that he could not remember the exact date that they cut down the tree.
Percy Taylor, who is presently incarcerated with defendant, also testified. He stated that they were cutting grass on May 15,[2] 1995 from about 8:00 a.m. until 2:00 or 3:00 p.m. at an apartment complex. He also testified that they cut grass for three days and he thought it was Friday, Saturday, and Sunday. He also admitted, on cross examination, that he did not know the defendant's whereabouts after 3:00 p.m. on the afternoon in question.
Finally, defendant testified on his own behalf. He admitted to an extensive criminal history with seven felony convictions and two misdemeanor convictions. He admitted that he pled guilty to those charges because "they had me right on the charges." He stated that he did not plead guilty to the present offenses because he did not commit these offenses.
He testified that, in May of 1995, he lived in a car in front of the victim's house. He stated that he could have stayed in the house but he didn't because T.S.'s mother was "a no good girl." Defendant testified that, on the date in question, he and Percy Taylor were cutting grass in the projects, "nowhere around [the] area" that T.S. lived. He further stated that, after they finished about 3:30 p.m., they went to Chateau Ames to "get high" and he did not return to his car/house that night.
He testified that he did not cut the grass at the victim's house on the date of the alleged attack but admitted that he cut their grass the day before. Strangely though, he testified that "the day [the victim's mother] put the charge on me is not really the day that she claimed that I messed with the little girl."
Defendant testified that he cut the victim's front yard on Thursday, May 11, 1995 but he stopped when it started getting dark. Then he sat smoking in his car in front of the victim's house, when he saw *1254 Duke Thomas, known as "Monkey Man," leave the victim's house. Defendant testified that Duke Thomas was shaking and very nervous when he left the victim's house. Finally, he reiterated that he did not rape the victim.
After hearing the testimony and reviewing the evidence, the jury voted unanimously that defendant was guilty of aggravated rape and voted eleven to one that he was guilty of aggravated crime against nature. The trial judge declared the jury's verdict legal.
On appeal, defendant asserts two assignments of error: first, that the evidence was insufficient to support the defendant's conviction for aggravated rape and "aggravated carnal knowledge of a juvenile"[sic] when the medical evidence was inconclusive and the lay testimony unreliable and, second, that the trial court erred by not granting a mistrial after the State failed to give proper notice of evidence it intended to use at trial and this evidence contradicted a medical report previously submitted by the same doctor.
When the issues on appeal relate to both the sufficiency of evidence and one or more trial errors, such as the erroneous admission of evidence, the reviewing court should first determine the sufficiency of the evidence by considering all of the evidence, including evidence the trial court may have erroneously admitted. State v. Hearold, 603 So.2d 731, 734 (La.1992); State v. Mayeux, 94-105 (La.App. 5 Cir. 6/28/94), 639 So.2d 828, 834.
If the appellate court determines that the evidence was insufficient, then the defendant is entitled to an acquittal, and no further inquiry as to trial errors is necessary. However, if the appellate court finds that the totality of the evidence was sufficient to support the defendant's conviction, it must then determine whether the trial court erred in admitting the questioned evidence and, if so, whether the trial court's error requires a reversal of the conviction or was harmless. State v. Alexis, 98-1145 (La.App. 5 Cir. 6/1/99), 738 So.2d 57, 64, writ denied, 99-1937 (La.10/13/00), 770 So.2d 339. Accordingly, we will first address defendant's argument that the evidence was insufficient to support the jury's verdict and, if necessary, his remaining assignments of error.
Defendant specifically contends that the State failed "to prove that a crime occurred, much less that the defendant was the perpetrator. He alleges the medical evidence was inconclusive. He also argues that the victim's testimony was not reliable. The State replies that the medical evidence and videotaped and live testimony of the victim at trial was sufficient to satisfy the Jackson test.
In reviewing the sufficiency of the evidence, due process requires the reviewing court to determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
Under Jackson, a review of a criminal conviction record for sufficiency of evidence does not require a court to ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. A reviewing court is required to consider the whole record, and determine whether a rational trier of fact would have found guilt beyond a reasonable doubt. The actual trier of fact is *1255 presumed to have acted rationally until it appears otherwise. State v. Mussall, 523 So.2d 1305 (La.1988).
In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual finding. State v. Stec, 99-633, p. 4 (La.App. 5 Cir. 11/30/99), 749 So.2d 784, 787. In the case of sexual offenses, the testimony of the victim alone can be sufficient to establish the elements of a sexual offense, even where the State does not introduce medical, scientific or physical evidence to prove the commission of the offense. State v. Hotoph, 99-243, p. 17 (La.App. 5 Cir. 11/10/99), 750 So.2d 1036, 1045, writ denied, 99-3477 (La.6/30/00), 765 So.2d 1062 and 765 So.2d 1066.
Defendant was convicted of aggravated rape,[3] which on the date of the offense was defined, in pertinent part, as:
[A] rape committed ... where the anal or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
* * *
(4) When the victim is under the age of twelve years. Lack of ... knowledge of the victim's age shall not be a defense.
Defendant was also convicted of aggravated crime against nature,[4] which at the time of the offense, was defined, in pertinent part, as:
A. Aggravated crime against nature is crime against nature[5] committed under any one or more of the following:
(1) When the victim resists the act to the utmost, but such resistance is overcome by force;
* * *
(6) When the victim is under the age of seventeen years and the offender is at least three years older than the victim.
In this case, the State presented Dr. Scott Benton, an expert in pediatric medicine and child abuse, to testify regarding his examination of the victim. Dr. Benton testified that a general physical exam was conducted and no visible trauma was noted. Further, no bruises, lacerations, or wounds were found during the general physical exam. The examination revealed no trauma to the victim's mouth or oral cavity.
Dr. Benton's initial physical examination of the victim's genital area revealed what appeared to be a normal hymen. After the vital dye test was performed and the victim's genital area was illuminated with ultraviolet light, however, Dr. Benton observed two separate abrasions on the victim's genitalia, which he documented in his report.[6] Dr. Benton concluded that these physical findings were consistent with the history of recent, blunt penetration trauma.
*1256 Further, pictures of the victim's genitalia were taken before and after the vital dye test with a special camera called a coplescope. During his preparation for trial, Dr. Benton reviewed both sets of photographs of the victim's vaginal area for the first time. After he reviewed the photographs taken after the dye test, he concluded that the lower part of the victim's hymen was swollen, which seemed to contradict his earlier finding of a normal physical examination. At trial, Dr. Benton explained that his revised opinion regarding the victim's swollen hymen was based on his review of the photographs taken after the dye test and also on experience and knowledge he had gained in the two years that had elapsed between the date he examined the victim and the date of trial.
In Dr. Benton's opinion, because the injuries were isolated to a protected area of the genital region, the injuries occurred when the child's legs were spread apart. He testified that it would take blunt penetration force to cause injury to the hymen, because of its location beneath three layers of defensive tissue.
Moreover, Dr. Benton testified that the injury to the hymen was recent because injuries to this part of the body heal "incredibly fast" and can actually heal within a day's time. In his opinion, the injury to the hymen was a specific indicator of sexual abuse. Ultimately, he opined that, overall, the victim's injuries were "highly suspicious" for "blunt penetration trauma, probably sexual assault."
On cross examination, Dr. Benton testified that, in his report, he stated the child's hymen was normally thin. He admitted that this finding was different from his trial testimony, wherein he stated the hymen appeared swollen. According to Dr. Benton, his conclusion that the hymen was swollen was reached after he viewed the photographs of the illuminated injuries after the dye test, which he had not seen prior to writing his initial report.
Dr. Benton admitted that he did not supplement his report with the current findings. He explained, however, that he did not refer to the report or pictures after the initial examination because T.S. did not return for her scheduled follow-up visit. Further, he was no longer consulting for the lead agency that he consulted for in 1995.
On cross examination, Dr. Benton conceded that it was "possible" the child's injuries were caused by her "scratching and digging at herself" but it "was not likely." Dr. Benton also testified that the rape kit was negative for blood or seminal fluid. He noted, however, that his current agency "did one thousand two hundred rape exams last year and there were no positive rape kits." He stated that, without DNA evidence, he could not specifically connect the defendant to the assault.
Here, defendant's first claim in his argument that the evidence presented was insufficient is that the medical evidence was inconclusive. Defendant maintains that Dr. Benton could not say that the child's injuries were not the result of the victim's own actions in digging and scratching herself. However, the trial transcript reflects that, when this question was posed to Dr. Benton on cross examination, he responded "anything was possible" but "it was not likely."
Next, he argues that no seminal fluid or blood was recovered from the victim. *1257 Initially, it is important to point out that emission is not necessarily an essential element of the crime of rape. La. R.S. 14:42(B). Moreover, as Dr. Benton testified at trial, the absence of these bodily fluids is not unusual in cases of child sexual abuse.
Next, defendant questions Dr. Benton's conclusions in this case because, at trial, he deviated from the findings presented in his initial report and he did not file a supplemental report. When Dr. Benton was specifically questioned about the difference in his report and his trial testimony, he stated that his initial opinion was that the victim's hymen was normal. After reviewing the photographs during his preparation for trial, some two years after the exam, however, he was able to see the swelling in the child's hymen depicted in the photographs.
He also explained that he did not supplement his report with these findings for several reasons. First, Dr. Benton had no occasion to review the report and photographs prior to trial preparation because the child did not return for a follow-up visit as scheduled. Second, he no longer consults for the agency for which he had prepared the initial report.
Finally, defendant alleges that Dr. Benton could not say conclusively that there had been a "rape" and "carnal knowledge of a juvenile[sic]." First, these are legal conclusions to be reached by the jury and not medical conclusions to be drawn by this expert. La.C.Cr.P. art. 802(2); See, State v. Hughes, 02-2455, p. 7 (La.1/31/03), 841 So.2d 718(expert testimony is excluded if there is a risk that the evidence might usurp the jury's province to determine defendant's guilt or innocence). Moreover, Dr. Benton did testify that T.S.'s overall injuries were "highly suspicious" of "blunt penetration trauma, probably sexual assault." In sum, we find no merit in defendant's argument that the medical evidence was inclusive.
Defendant's second claim in his insufficient evidence argument is that the victim's testimony was unreliable. In the videotape and live testimony presented at trial, the victim recounted the events of May 12, 1995 as she remembered them.
She stated that her mother was going to take a nap with T.S. and her siblings. Before their nap, her mother asked the defendant if he needed anything because she was going to go to sleep and he said no. T.S. went to the bathroom. Defendant knocked on the window and T.S.'s little sister opened the door for him.
Defendant followed T.S. to the bathroom, locked the door and put his "thing" in her mouth. Defendant told T.S. not to tell her mother because he would hurt her. He took the child into her mother's bedroom where he removed her underwear. He then put his "thing" in her mouth and "down there." T.S. testified that his "thing" was "his private." T.S. screamed when it happened. T.S. stated that defendant told her to shut up.
T.S. testified at trial that, when her mother woke up, defendant ran and he did not cut the grass any more. She said before this incident she liked defendant, but she does not like him any more.
Defendant alleges that there are inconsistencies in the child's testimony about whether "Bubby" ran away or returned to cutting grass; whether the child went to school on the day of the assault; the location where the child's mother and siblings slept that day; whether defendant ejaculated; and whether T.S. had been threatened.
*1258 Although there may be slight inconsistencies in minor details of the events surrounding her attack, the child never wavered in her statementto her mother, Officer Carrone, Dr. Benton, Omalle Gordon, and, finally, at trialthat defendant put his "thing" in her mouth and "down there," i.e. in her vagina. Further, the alleged discrepancies are not necessarily indicative of untruthfulness or incompetence. Rather, memory lapse and alleged inconsistencies may have resulted from the child's tender age5-years-oldon the date of the incident; the traumatic nature of the experience; exposure to unfamiliar surroundings; or the method of interrogation. See, State v. Foy, 439 So.2d 433, 434 (La.1983).
Furthermore, Dr. Benton, an expert in child sexual abuse, stated that it is not unusual for a child to block such experiences from their memory because the level of trauma can cause a child to either forget or even fail to register certain events. We find defendant's argument that the victim's testimony was unreliable without merit.
Furthermore, at trial, the jury heard the testimony of the State's and defense witnesses, including the victim and her examining physician. After weighing the testimony, the jury found the testimony of the victim and her examining physician more credible than that of the defendant. The credibility of witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. State v. Kinsel, 00-1610, p. 11 (La.App. 5 Cir. 3/28/01), 783 So.2d 532, 537, writ denied, 01-1230 (La.3/28/02), 812 So.2d 641. It is not the function of the appellate court to assess the credibility of witnesses or reweigh the evidence. State v. Marcantel, 00-1629 (La.4/3/02), 815 So.2d 50, 56; State ex rel. Graffagnino v. King, 436 So.2d 559, 563 (La.1983); State v. Kinsel, supra.
In sum, viewing the evidence in the light most favorable to the prosecution, we conclude that the State presented sufficient evidence such that any rational trier of fact could find that the State proved the essential elements of the crimes of aggravated rape and aggravated crimes against nature beyond a reasonable doubt. Defendant's first assignment of error lacks merit.
In his second assignment of error, the defendant claims that "the trial court erred by not granting a mistrial after the State failed to give proper notice of evidence it intended to use at trial and this evidence contradicted a medical report previously submitted by the same doctor." Specifically, defendant argues that the victim photographs admitted as evidence at trial should have been disclosed by the State. He argues that the failure to disclose the photographs prejudiced him because, if he had known of this evidence, he would have secured an expert to refute Dr. Benton's findings allegedly based upon said photographs. In sum, defendant reasons that the trial judge first erred in admitting the photographs into evidence and, next, erred when he refused to grant a mistrial, after the State's expert used the photographs at trial to support his conclusions of sexual abuse.
The State responds that defendant did not lodge a contemporaneous objection to the admissibility of the photographs until the close of the State's case and did not move for a recess of the trial to secure an expert when he became aware of the photographs so he has waived any objection. Further, the State asserts that, even if there was a discovery violation, the defendant cannot demonstrate prejudice because, *1259 first, Dr. Benton's report was sufficient to place defendant on notice that his findings indicated sexual abuse and, second, defendant was afforded extensive cross examination of the State's expert at trial. Finally, the State responds that, even if their introduction was erroneous, it was harmless because the photographs constituted cumulative evidence.
In this case, defendant filed pre-trial discovery motions that particularly sought photographs in the State's possession, control, or custody. Before trial, the State gave the defendant Dr. Benton's report. The photographs in question were not produced because the photographs were not attached to or referenced in Dr. Benton's report.
On the second day of trial, defendant filed a written motion in limine seeking suppression of the photographs on the grounds that the pictures were "gruesome" and "highly inflammatory," such that "the prejudicial effect outweighed the probative value." At the hearing on defendant's motion in limine, defense counsel notified the trial judge that she had not received a copy of the photographs during discovery.
The prosecutor told the trial judge that he did not know of the photographs until a "few day before trial" when he learned of the photographs during a meeting with Dr. Benton. Dr. Benton, however, would not allow him to have access to the photographs until he obtained a court order due to their sensitive nature and the nature of this case. At the hearing on the motion in limine, the prosecutor stated that he had not yet seen the photographs in question.
Defense counsel argued that, although she had not seen the photographs, she could infer that the vaginal photos must be "highly inflammatory" since the physician would not release them without a court order. She also alleged the photos gave the case a "different twist" and, now, she did not have the opportunity to secure an expert because of the late disclosure.
The prosecutor argued that the photographs would merely support the information contained in the medical report. Further, he argued that the report indicated two separate "abrasions" in the vaginal area indicative of sexual assault, which should have given defendant adequate warning to secure an expert.
The trial judge reserved his ruling until after he could conduct an in camera inspection of the evidence. After Dr. Benton arrived on the second day of trial, he produced the photographs, which the State presented to the trial court for inspection. After reviewing the two photographs, the trial judge stated:
I believe that the defense's argument is that these photographs are gruesome and inflammatory in nature. In reviewing them, I find nothing which is in any way gruesome about the photographs. In fact, I would think they quite possibly unless someone is given a description of what is depicted in those photographs, I'm not sure that the average person would be able to recognize what is depicted in these photographs. And if there's going to be medical testimony given in support of what these photographs depict, then I find nothing which would be inflammatory or prejudicial by allowing the Doctor to testify and use these photographs during the course of his testimony. And I see nothing at this time which would be prohibitive in them as far as them being introduced into evidence. However, there's been no request to admit them, so I would reserve *1260 my ruling on the admission until the time the request is made.
Thereafter, the defendant lodged an objection.
During his trial testimony, Dr. Benton identified two photographs, which were admitted without defense objection[7] as State's Exhibits Nos. 4 and 5, as coplescopic photographs taken by Dr. Benton of the victim's genital area during his examination of the victim. Dr. Benton showed the jury that the victim's hymen appeared swollen in one of the photographs, which is an indicator of recent blunt penetration trauma and also a specific indicator of sexual abuse in a very young child. He admitted that this specific genital injury had not been noted in his medical report.
Following Dr. Benton's testimony and outside of the jury's presence, the defendant moved for a mistrial. Defense counsel reiterated her allegation that the photographs were prejudicial. She also noted Dr. Benton's trial testimony was contradictory to his report because, in his report, he said the hymen was normal but, at the trial, he said the hymen was swollen. Defendant contended Dr. Benton's contradictory findings were based on the photographs. She further argued that, if had she seen the photos earlier, she would have been prepared to refute the doctor's testimony. Finally she alleged that Dr. Benton's medical report was not sufficient to alert her of what would happen at trial.
The State responded that the testimony was not contradictory. The prosecutor also alleged that the report, which was three or four pages in length, contained sufficient information that Dr. Benton concluded T.S. was the victim of sexual assault to alert the defendant to employ an expert.
After reviewing Dr. Benton's medical report, the trial judge denied defendant's motion for mistrial, stating:
Basically, the report by Dr. Benton states in part, relative to the general exam, it makes reference to the clitoris being normal, the hymen being normal, without evidence of scarring and good posterior margins. It goes further to say that there were mild abrasions in the posterior faucet area and it concludes by stating that the doctor's impressionsand I quote, "The physical exam revealed mild abrasions to the faca navicularus (phonetic) and posterior faucet. Samples of fluorescent materials were sent for sperm analysis. The abrasions are non-specific indicators supportive of history. The presence of sperm would be diagnostic of sexual assault." Therefore, what I conclude from the testimony, from the report and from the photographs, is that there were examinations of more than one particular area beyond merely examining the condition of the child's hymen in order to allow the doctor to make certain conclusions. Specifically, I'm referring to the examination of the areas which revealed the mild abrasions to the faca navicularus and the posterior faucet, which I'm sure the Doctor testified as to what these particular areas were, but my memory fails me now. However, I do consider that a partand correct me if I'm wrongof the genitalia or the genital area of this child. Now, if you all want to correct me and that is not a part of the genital area of this child, which was examined by the Doctor, then, feel free to correct me. As a result, I believe that the conclusions that the Doctor arrived at were not based solely *1261 on the condition of the hymen and you were given ample opportunity to question him on cross-examination relative to the difference which you state are contained in his report relative to the testimony he presented today, relative to the photographs. And I believe that's going to be an issue which the jury will have to make a decision on. Therefore your request for a mistrial is denied. (Emphasis added).
Defense counsel objected.
On appeal, defendant argues that the State should have disclosed this evidence and, absent such a disclosure, the photographs should have been suppressed or a mistrial granted when the State's expert used this evidence to form an opinion, which differed from that previously espoused in the medical report. Initially, the State notes that defendant did not object to the photographs until after they were admitted into evidence and no objection was lodged to Dr. Benton's testimony regarding the photographs.
Generally, an irregularity or error cannot be availed of after verdict unless it was objected to at the time of the occurrence. La.C.Cr.P. art. 841(A). The purpose of the contemporaneous objection rule is to put the trial judge on notice of the alleged irregularity so that he may cure the problem and to prevent the defendant from gambling for a favorable verdict and then resorting to appeal on errors that might easily have been corrected by objection. State v. Thomas, 427 So.2d 428, 433 (La. 1982); State v. Harris, 02-397, p. 25 (La. App. 5 Cir. 9/30/02), 829 So.2d 530, 539.
However, an exception to the rule exists when, as here, the objection is embodied in a written motion. La.C.Cr.P. art. 841(B); State v. Butler, 30,798 (La.App. 2 Cir, 06/24/98); 714 So.2d 877, 894. In the motion in limine filed and heard before Dr. Benton's testimony in this case, defendant objected to the photographs on the basis that (1) they were not disclosed in discovery, (2) they were gruesome and highly inflammatory, and (3) the prejudicial effect outweighed the probative value. As such, we will address defendant's claim that the trial court erred in allowing the introduction of the coplescopic photographs.
Louisiana's criminal discovery rules are intended to eliminate unwarranted prejudice arising from surprise testimony and evidence, to permit the defense to respond to the State's case, and to allow a proper assessment of the strength of the State's case. La.C.Cr.P. arts. 716-729; State v. Brazley, 97-2987, p. 3 (La.10/14/98), 721 So.2d 841, 842; State v. Dennis, 00-182, p. 10 (La.App. 5 Cir. 12/14/00), 777 So.2d 569, 572, writ denied, 01-0163 (La.11/21/01), 802 So.2d 629.
La.C.Cr.P. art. 718 provides for discovery of documents and tangible evidence, including photographs, which are within the possession, custody, or control of the state when items sought are (1) favorable to the defendant and material and relevant to guilt or punishment; (2) are intended for use by the state as evidence at trial; or (3) were obtained from or belong to the defendant. State v. Ray, 423 So.2d 1116, 1118 (La.1982); State v. Ware, 01-194, p. 15 (La.App. 5 Cir. 8/28/01), 795 So.2d 495, 502. Discovery is not limited to what is contained in the district attorney's file. State v. Lee, 531 So.2d 254 (La.1988).
The State has a continuing duty of disclosure and if the State, subsequent to ordered disclosure, discovers additional evidence or decides to use a particular item *1262 as evidence at trial, the State has a continuing duty to notify the defendant of the evidence and of its intended use at trial. La.C.Cr.P. art. 729.3; State v. Williams, 448 So.2d 659, 664 (La.1984).
In this case, defendant challenges the late disclosure of specifically-requested evidence, which the State intended to use at trial. He argues that the State had "control" of the evidence for two years and failed to disclose it timely.
While we agree that the coplescopic photographs were subject to the State's continuing duty to disclose evidence, we do not agree that the State had control of the evidence for two years before trial. Here, the prosecutor stated that he learned of the existence of the photographs in a meeting with Dr. Benton the Friday before trial.[8] The prosecutor did not know that photographs were often taken during sexual examinations of this type. Additionally, he indicated that he was not alerted to the existence of the photographs since no mention was made of them in the medical report.
Moreover, at the hearing on the motion in limine on the beginning of the second day of trial the prosecutor had not seen the photographs and did not have possession of them. Importantly, defense counsel, upon filing her written motion, stated that the prosecutor told her about the photographs on the previous day, just two business days after he learned of their existence.
Furthermore according to the prosecutor, Dr. Benton, who was in possession of the photographs, refused to release the photographs without a court order. The prosecutor apparently secured the necessary order, pursuant to which Dr. Benton produced the photographs on the day he testified at trial.
Since the prosecutor could only obtain the evidence by a court order, we find that this evidence was not under his "control" for two years. Further, we find that when he became aware of its existence, he took steps to secure the evidence and promptly notified opposing counsel of its existence. Thus, we agree with the trial court's implicit ruling that the State did not commit a discovery violation.
Defendant also argues that there was an obligation for the prosecutor to learn of the existence of this evidence, relying on Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). We find his reliance is misplaced.
In Kyles, the prosecution failed to disclose eyewitness and informant statements, as well as police investigation information, that was favorable to the defendant and material to his guilt. On the basis that the undisclosed evidence was both "favorable" and "material," the United States Supreme Court reversed the defendant's conviction. In this case, the defendant has not shown that the photographs were "favorable" or "material," thus triggering a prosecutorial obligation to learn of their existence. We find no merit in this contention.
Defendant contends the photographs' late disclosure warranted sanctions, such as suppression, and absent that remedy, a mistrial should have been granted. The trial court has wide discretion in fashioning a remedy for what it perceives to be a discovery violation. State v. Black, 34,688, p. 22 (La.App. 2 Cir. 5/9/01), 786 So.2d 289, 298.
*1263 Here, we note that the trial judge did not find that the State had committed a discovery violation. Further, we do not find that the State committed a discovery violation in this case, which would warrant a remedy. Accordingly, the trial judge did not abuse his discretion when he refused to suppress the photographs or grant a mistrial. Additionally, reversal is not warranted because, due to the cumulative nature of the information contained in the photographs, there has been no showing that substantial prejudice deprived defendant of a fair trial. In sum, defendant's second assignment of error also lacks merit.
Finally, we have reviewed the record for errors patent, according to La.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La. 1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). We have found the following errors patent, which require remand. First, the trial judge did not advise the defendant of the appropriate prescriptive period for filing post-conviction relief as required by La.C.Cr.P. art. 930.8. Second, defendant was convicted of La. R.S. 14:42 and La. R.S. 14:89.1, which are both defined as "sex offenses." La. R.S. 15:540 et seq. requires registration of sex offenders. The trial judge did not, however, provide the defendant with written notification of the registration requirements of La. R.S. 15:542, as required by La. R.S. 15:543(A).
We remand, therefore, in order for the trial court to inform defendant of the applicable prescriptive period provided by La. C.Cr.P. art. 930.8. and the registration requirements of La. R.S. 15:542 by sending appropriate written notice to defendant within ten days of this opinion, and to file written proof in the record that defendant received such notice. State v. Maise, 00-1158 (La.1/15/02), 805 So.2d 1141, 1153; State v. Stevenson, 00-1296 (La.App. 5 Cir. 1/30/01), 778 So.2d 1165.
CONVICTIONS AND SENTENCES AFFIRMED; REMANDED FOR COMPLIANCE WITH LA. C.CR.P. 930.8 AND LA. R.S. 15:524
NOTES
[1] In accordance with La. R.S. 46:1844(3), the victim, who is a minor, and her family will be referred to by their initials to protect the victim's identity.
[2] In the interest of completeness, defense counsel asked this witness about events that transpired on May 15, 1995, which was not the date of the alleged incident. According to other testimony, the incident was reported the same date that it allegedly occurred, which was Friday, May 12, 1995.
[3] La. R.S. 14:42.
[4] La. R.S. 14:89.1.
[5] Crime against nature occurs when there is unnatural carnal copulation by a human being with another of the opposite sex, when the genital organ of at least one person is used. La. R.S. 14:89.
[6] The medical report was not filed into evidence and does not appear in the record on appeal. At trial. Dr. Benton testified that the abrasions were adjacent to the victim's hymen and in the area between the vagina and the anus.
[7] At the close of the State's case, defendant did lodge an objection to the photographs.
[8] Trial commenced on Tuesday, April 15, 1997.