# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 19-390

**STATE OF LOUISIANA**

**VERSUS**

**JOSHUA BABINEAUX**

**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 15-K-0293-B
HONORABLE A. GERARD CASWELL, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

## SHANNON J. GREMILLION
## JUDGE

**\*\*\*\*\*\*\*\*\*\***

Court composed of John D. Saunders, Shannon J. Gremillion, and John E. Conery, Judges.

**CONVICTION AND SENTENCE AFFIRMED.**

**Pride J. Doran**
**Dwazendra Smith**
**Doran & Cawthorne, P.L.L.C.**
**Post Office Box 2119**
**Opelousas, LA 70571**
**(337) 948-8008**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Joshua Babineaux**

**Earl B. Taylor**
**District Attorney, Twenty-Seventh Judicial District**
**Kathleen E. Ryan**
**Assistant District Attorney**
**Post Office Drawer 1968**
**Opelousas, LA 70571**
**(337) 948-0551**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**GREMILLION, Judge.**

Defendant, Joshua Babineaux, was charged by bill of information filed on July 24, 2015, with second degree cruelty to juveniles, a violation of La.R.S. 14:93.2.3. An amended bill of information adding the charge of oral sexual battery of a victim under the age of twelve, a violation of La.R.S. 14:43.3, was filed on March 10, 2017.

On November 7, 2017, the State amended the bill of information to charge oral sexual battery without the victim being under thirteen years of age. Defendant then entered a "no contest plea under State versus Alford" to the charge of second degree cruelty to juveniles. Sentencing proceedings were held on November 29, 2017, December 27, 2017, and April 13, 2018. On April 13, 2018, Defendant moved to withdraw his guilty plea, and the trial court granted that motion. A second amended bill of information was filed on December 13, 2018, charging Defendant with second degree cruelty to juveniles and oral sexual battery on a victim under the age of twelve.

Defendant waived his right to trial by jury on January 3, 2019, and a bench trial commenced. Defendant was found guilty of second degree cruelty to juveniles and not guilty of oral sexual battery on January 4, 2019. On January 24, 2019, Defendant was sentenced to serve five years at hard labor. A Notice of Appeal was filed on January 31, 2019, and was subsequently granted.

Defendant asserts the following errors:

    1. The trial court erred in finding Babineaux guilty of second-degree cruelty to juveniles when [there was] insufficient evidence to establish that defendant intentionally placed the victim in hot water or any other elements of the offense.

    2. The trial court erred by placing too much weight on Dr. Wood's expert testimony to find Babineaux guilty of second degree cruelty to juveniles.

    3. The trial court erred in excessively sentencing Babineaux to five years at hard labor for this first time felony conviction.

**FACTS**

J.R, who was four years old on the date of the offense, was burned with hot water during a bath.[1]

**ERRORS PATENT**

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find there is one error patent.

There was no written waiver of jury as required by La.Code Crim.P. art. 780. However, Defendant and his attorney were in open court when the trial court extensively questioned Defendant regarding his waiver of jury trial. The trial court found that Defendant knowingly and voluntarily waived his right to jury trial. *See State v. Bell*, 13-1443 (La.App. 3 Cir. 6/4/14), 140 So.3d 830 (this court found the error in failing to obtain a written waiver harmless where defendant and his attorney were in open court when the judge addressed his right to, and waiver of, jury trial.) *See also State v. Loyd*, 18-968 (La.App. 3 Cir. 6/5/19), 274 So.3d 112. Accordingly, the error in failing to obtain a written waiver in violation of La.Code Crim.P. art. 780 is harmless under the facts of this case.

**SUFFICIENCY OF THE EVIDENCE**

In his first assignment of error, Defendant contends the trial court erred in finding him guilty of second degree cruelty to juveniles when there was insufficient evidence to establish that he intentionally placed the victim in hot water or any other elements of the offense.

> Under the due process standard of *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original), "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a

---

[1]The victim's initials are used in accordance with La.R.S. 46:1844(W).

2

reasonable doubt." When reviewing a conviction based upon circumstantial evidence, the reviewing court must determine whether, viewing the evidence in the light most favorable to the prosecution, a reasonable trier of fact could have concluded beyond a reasonable doubt that every reasonable hypothesis of innocence had been excluded. *See State v. Morris*, 414 So.2d 320, 321–22 (La. 1982) (citation omitted); *see also State v. Captville*, 448 So.2d 676, 680 (La. 1984) ("When a case involves circumstantial evidence, and the jury reasonably rejects the hypothesis of innocence presented by the defendant's own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt."). The reviewing court "does *not* determine whether another *possible* hypothesis has been suggested by defendant which *could* explain the events in an exculpatory fashion[; rather, the reviewing court] evaluates the evidence in the light most favorable to the prosecution and determines whether the alternative hypothesis is sufficiently reasonable that a rational factfinder could not 'have found proof of guilt beyond a reasonable doubt.' " *Captville*, 448 So.2d at 680 (emphasis in original; citation omitted).

*State v. Lewis*, 17-81, pp. 3-4 (La. 10/18/17), 236 So.3d 1197, 1198-99 (alteration in original).

Defendant was convicted of second degree cruelty to juveniles, which is defined as:

> A. (1) . . . the intentional or criminally negligent mistreatment or neglect by anyone over the age of seventeen to any child under the age of seventeen which causes serious bodily injury or neurological impairment to that child.
>
> (2) For purposes of this Section, "serious bodily injury" means bodily injury involving protracted and obvious disfigurement or protracted loss or impairment of the function of a bodily member, organ, or mental faculty, or substantial risk of death.

La.R.S. 14:93.2.3.

> The statute also requires that the State prove Defendant acted with intent or criminally negligent mistreatment or neglect. "'Intentional,' as used in the aforementioned statute pertaining to cruelty to a juvenile, refers to general criminal intent, present whenever there is specific intent and also when circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act." *State v. Green*, 449 So.2d 141, 144 (La. App. 4 Cir. 1984). Criminal negligence is defined as "such disregard of the interest of others that the offender's conduct amounts

3

to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances." *Id.*

*State v. Cooper*, 15-820, p. 13 (La.App. 4 Cir. 9/13/17), ___ So.3d ___, ___, *writ denied*, 17-1561 (La. 11/28/17), 230 So.3d 222.

Allison Roy, a former employee of Hearts of Hope, interviewed J.R. on February 5, 2015. J.R. was four years old at that time. A video of the Hearts of Hope interview was submitted as State's Exhibit 1 and played for the trial court. During the interview, J.R. spontaneously told Roy that she had burns. J.R. further stated that her dad wanted to blame it on her, but he ran the hot water. J.R. explained that Defendant's son got a scooter for Christmas. She claimed she had a scooter at her grandmother's house, and the scooter had been in the yard and gotten dirty. Thus, her grandmother threw it away. Defendant subsequently told J.R. she did not need toys. He then ran hot water and made her sit down. J.R. further claimed Defendant choked her, slammed her in bed, and made her urinate on herself. Defendant subsequently ran the water and told her to sit down. J.R. also stated Defendant bit her on the hand. During this interview, J.R. also stated the Defendant placed his penis in her mouth.[2]

Sherika Roberts was the mother of J.R., who was eight years old at the time of trial. Sherika was also friends with Defendant. She had an intimate relationship with Defendant and believed he was J.R.'s father. After the events at issue, DNA tests confirmed Defendant was not J.R.'s father.

J.R. met Defendant when she was one or two years old and began visiting him when she was three or four years old. J.R. spent the night with Defendant and his family, which included his wife and two kids. There was no visitation schedule, and

---

[2]Because Defendant was found not guilty of the oral sexual battery charge, we have left out testimony pertaining to that crime.

4

Defendant would call for J.R. to visit. J.R. had visited Defendant four or five times before she was burned.

Sherika testified that Defendant picked J.R. up on a Friday in January 2015 from school. Sherika checked on J.R. by phone on Friday and Saturday, and she was fine. On Sunday, Sherika missed a call from Defendant while she was playing cards at her father's house. Sherika eventually spoke to Defendant, and Defendant informed her that J.R. had been burned in the tub. He stated he would try to bring her to the doctor Monday, and his wife was a nurse and could take care of it. Sherika had had a couple of drinks and panicked. Defendant then stopped answering his phone. Sherika got his address from a text message and went with several family members to his house, which she had not been to before.

Once at Defendant's house, Sherika brought J.R. outside and placed her in the truck. This caused J.R. pain, so Sherika laid her down and unzipped the onesie she was wearing. J.R. had tape and gauze on her body. Sherika removed it and saw pink. She then called police. J.R. was transported by ambulance to Our Lady of Lourdes. J.R. was subsequently transferred via ambulance to Baton Rouge General Burn Center. J.R.'s injuries were depicted in State's Exhibits 2, 3, and 4. J.R. remained at the burn center for approximately three months.

Sherika testified the burns had to be scraped and skin grafts performed. J.R. had a feeding tube and had to learn to walk and eat again. She also had therapy. Sherika described what J.R. was like during the first two weeks of her hospital stay:

> Well, when we first got there, [J.R.] was- - it was hard. [J.R.] had to- - they were scrubbing her burns. [J.R.] screamed in her sleep. She wasn't sleeping. She couldn't eat. She was in a lot of pain, crying all night. She couldn't move. It was just heartbreaking.

J.R.'s medical records were admitted as State's Exhibits 5 and 6.

According to Sherika, J.R. did not like to go to Defendant's house and would cry. The last time J.R. visited before she was burned, she had ant bites all over. She also suffered human bites.

Sherika believed Defendant ran J.R.'s bath water and put J.R. in the water. She did not believe J.R. got into the water on her own. Sherika was questioned by defense counsel about a proceeding held in November 2017 as follows:

Q.    And do you recall me continuing by saying, that she got in the water on her own, and you said, uh-huh, to which I replied, correct, and you said, uh-huh. Do you recall that?

A.    Yes, I do recall.

Q.    Okay. All right, and then I asked, wouldn't it be true that that version of events is consistent with what [J.R.] told you at the very beginning?

. . . .

Q.    Has [J.R.] ever told you that Joshua Babineaux picked her up and dropped her in that water?

A.    After everything happened, yes, she did tell me. She told me the story about what happened.

Sherika assumed the water was boiled, but J.R. did not tell her that. J.R. also never said Defendant dumped her in the water. Sherika had no independent knowledge of what happened in Defendant's bathroom.

When asked what J.R. told her about the bath, Sherika testified:

The hot water- - she, she said she got in the tub, and he told her, don't get out, don't- - or I'm coming, or don't get out or whatever. I don't know- - I don't remember exactly what, and she said that whenever she was- - you know, she was hollering and telling him it was hot. She was crying, and I don't remember.

Melissa Roberts, Sherika's mother, also testified at trial. J.R. told Melissa that Defendant pulled his pants down and put his penis in her mouth. J.R. also stated Defendant bit the tips of her fingers. J.R. further reported to Melissa that Defendant threw her in bed and choked her, which made her urinate on herself. She then went

to take a bath. Melissa testified that J.R. screamed and hollered when Defendant picked her up for visitation. Melissa thought J.R. "was just being spoiled, but she was afraid of him."

Melinda Martin, a nurse at the burn center, was involved in the care of J.R. Melissa called her into the room to hear J.R.'s statement. J.R. was alert at that time. J.R. told Martin Defendant placed his penis in her mouth and instructed her how to move her head up and down. Martin was asked if there was anything unusual about J.R.'s injuries, and she replied, "Yes, just the nature of the burns, and when you're a burn nurse, you learn to understand what a dip is, a sock burn." She described that term as follows, "When you look at the feet, and you have an even circle around and a knife jack burn, where the buttocks are pushed down and the feet are pushed down, the soles are somewhat spared, and the buttocks and lower back are burned." Martin testified J.R. had unusual marks "between her fingers, knuckles area." J.R. stated Defendant bit her and put his hands around her neck and slammed her against a bed.

At the time of trial, J.R. testified that she was eight years old, however the incident took place when she was four years old. She indicated that after she opened presents, Defendant brought her to a girls' bedroom. He threw her into the air, and she fell back on the bed. She did not remember if this was fun or if Defendant was angry. She subsequently agreed that Defendant looked angry. She thought he might be angry because her grandmother threw away the scooter Defendant had bought her. J.R. also testified that Defendant hung her in a closet, but she was not sure on what day that occurred. J.R. further testified that Defendant bit her fingers, but she was not sure when this occurred. She testified that she thought she bit Defendant after he told her to bite him. He then bit her. Defendant also hurt her when she was burned. J.R. testified that before the bath, Defendant made her suck his private part.

7

J.R. said Defendant ran the bath water, and when Defendant was finding clothes for her, she got into the tub. When asked if Defendant was in the bathroom when she got into the tub, J.R. stated, "I'm going to say, "'no.'" J.R. testified that she undressed herself and got into the tub by herself. J.R. told Defendant the water was hot more than once, and he told her to get in. She did not feel like she could get out of the tub. She indicated she got out of the tub by herself, and Defendant was not in the room. She dressed herself and went to the boys' room. Defendant realized she had "all kinds of scars and stuff all over [her]," so he called her mother. J.R. indicated it hurt a lot, and she did not sleep that night. The next morning, she told "them" she was in pain. J.R. testified Defendant told her not to tell anyone.

J.R. said she got into the tub by putting one foot first then the other, and her feet burned. She then told Defendant the water was hot. He told her to "'just get in it.'" J.R. was further questioned about the events as follows:

> Q. . . . Okay, so what did you do from there? Let's imagine that the sides of the tub. Did you put your hands on either side of the tub?
>
> A. Yes.
>
> Q. And did you try to sit your bottom down in the water?
>
> A. Yes.
>
> Q. Okay, and what was your reaction? Did you hop back up, because it was too hot, . . .
>
> A. Yes.
>
> Q. . . . or did you force yourself to sit down, because you were trying to obey dad?
>
> A. When he left the room, I stood back up, but then I sat down and then the water started to get like hot.
>
> A. Too hot to bear?
>
> A. Yes, and then, then when I got out- - I don't know.

Q.     I know this is hard for you.  We're not going to try to go too long with this.  Do you know, do you have a rough idea how long you were in that tub?  Do you know about how long five minutes is?

A.     Yes.

Q.     Okay.  Was it longer than five minutes?

A.     No.

. . . .

Q.     Was it longer than one minute?

A.     Nodding affirmatively.

. . . .

A.     Wait, I think it was five.

Q.     It was about five.  Okay, so you hop out the tub.  Was Joshua back in the room when you got out the tub, when you first got out?

A.     Yes, he came get me, and I wrapped the towel around me, and then I told, I told him, when we got in the boys' room- - the boys are out, though.  I told him when we got in the boys' room, that I felt not normal.

. . . .

Q.     Okay.  All right, so what did Josh do when you said, I'm not feeling normal?

A.     I didn't think he answered me.

J.R. indicated that Defendant saw her feet, and she thought he saw her "behind" when she put her clothes on.  Defendant called someone and told "her to bring something to put on the stuff I had."  J.R.'s injuries were then wrapped, and she put on a onesie.  She again stated she did not sleep well that night.  The following morning, she told "them" she was hurting.  When her mother came to pick her up, J.R. told her she would tell her what happened when they go home because Defendant told her not to tell anyone.  J.R. was asked if she showed Defendant her feet.  She replied, "He saw it.  He saw it."

9

J.R. testified that she was scared of Defendant "[e]ver since he picked [her] up [at her] maw-maw['s]." She indicated she was scared of Defendant when she first met him because she did not know him, but she did not tell her mother she was scared.

Detective Eric Reed went to the burn unit on January 19, 2015, to investigate a sexual battery complaint. He recorded the interview of J.R., who appeared to be clear headed at that time. In the interview, J.R. reported that Defendant said she ran the hot water, but she did not. She also said that when she screamed loud, Defendant put hot water on her back and leaned her against the hot water. During that interview, J.R. further stated Defendant bit her hands/fingers. He also made her put her mouth on his penis.

Dr. James Wood was accepted as an expert in pediatric surgery with a subspecialty in pediatric burns. He indicated J.R. presented with "bilateral lower extremity injuries to the legs and feet, as well [as] thermal injuries to her lower back and buttocks." She had "deep partial and full thickness burns." Skin grafts were done to both feet and ankles and the lower back. Dr. Wood noted the pediatric critical care physician who did the initial consultation described the burns as a "classic dip pattern . . . of thermal injury, which [was] consistent with patients who are put into the water." J.R. had a "classic injury pattern . . . for non-accidental trauma." Dr. Wood testified that delay in presentation raised red flags in non-accidental trauma cases. He considered an injury occurring on Saturday at approximately 3:00 or 4:00 and presentation in the emergency room at 10:00 Sunday delayed presentation. Dr. Wood testified that delayed treatment after burns could cause anorexia, dehydration, pain, fever, and systemic response syndrome. Systemic response, left untreated, could result in a substantial risk of death.

Dr. Wood declared J.R. experienced anorexia, dehydration, and fever, and she needed tube feeds to give her adequate nutrition. She also had a "foley catheter or urinary catheter" at some point during hospitalization. J.R. presented with "fairly classic" symptoms of systemic inflammatory response syndrome. Ten to fourteen percent of J.R.'s body was damaged. That was considered a significant burn injury. Dr. Wood opined that J.R. would have had some signs of injury immediately. The injuries depicted in State's Exhibits 2, 3, and 4 would not have begun to occur twelve hours after the burns. Dr. Wood testified there were a mixture of blisters and skin sloughing off. Additionally,

> over the course of the twenty-four hours, the blisters would have been burst, . . . and then the skin would begin sloughing in those areas, as well, but in the exact timing of when the blisters would arise, I think is maybe irrelevant to the fact that this, what I see in these, and of course, this was not when I saw initially, but what I see in these pictures would not be consistent with a burn injury that was not immediately evident as a significant burn injury.

Dr. Wood testified the burns to the bottoms of the feet do not manifest as significantly as other areas, but the thermal injury was still there. He opined it would have been unlikely that J.R. "walked on her feet like that." He then stated, "I would think it would be unlikely that she could have walked without significant discomfort." He testified that kids were more prone to thermal injuries because their epidermis was thinner.

Dr. Wood agreed that scarring could occur at water temperatures as low as 110 degrees, which may not feel too hot to an adult. The higher the temperature, the less exposure required for injuries to occur. Dr. Wood opined that water temperatures that would cause a full thickness burn to one person would not necessarily cause a full thickness burn to another. He indicated that different children might be able to handle the same water temperature for different amounts of time.

Dr. Wood was questioned about J.R. and responded as follows:

> A.     Correct.  What I understand you to have asked me there was-- is her getting into the bathtub and stepping into it, either on her own or being told to, and sitting down for a little while and then getting out.  Is that consistent with what I saw and what made me have suspicions of non-accidental trauma, and the answer to that was, "No." If I misunderstood-- I may have misunderstood the question then, or maybe I misunderstood it now.

Dr. Wood then indicated his classification of the cause of J.R.'s injuries as non-accidental trauma was based on "journalizations about splash patterns" and statements made by J.R. at the hospital.  Dr. Wood agreed that the statements J.R. made at the hospital were inconsistent with what she testified to at trial.

Dr. Wood testified as follows when asked by defense counsel if the delay in treatment caused additional injuries to J.R.:

> My testimony would be that delay in treatment, certainly could have caused additional injury.  I would not say that her delay in presentation of thirty hours, definitively caused additional, depending also what you mean by injury.  If you mean in terms of the burn injury itself, or do you mean in terms of her-- lengthened her hospital-- you probably need to be a little more specific.  If you're asking if that would include things, such as her hospital stay, very likely it was a little longer because of it, sure, then I would actually say, probably, being at home for thirty hours with the burns, as opposed to getting immediate treatment, probably did affect her (inaudible) ; and so if that, if you're including that sort of thing, and did it cause more injury, yes.  If you're asking, sort of what I said to [the prosecutor], if you're asking, specifically, do I think that presentation, delayed presentation of twenty-four to thirty-- whatever, thirty hours, was-- that there are-- that there were objective differences that I could document in her injury, then no, I couldn't objectively say anything specific about how that would affect her.

It was "probably unlikely" the delay increased the portion of J.R.'s wounds that needed grafting.

Dr. Wood agreed that at the time J.R. left Lourdes, she had been diagnosed with second degree burns.  Second degree burns typically needed some type of treatment.  Dr. Wood stated, "Is it factually true that some second[-]degree burns,

12

again, meaning superficially partial thickness burns and-- may be able to have treatment at home initially, yes, I would agree with that."

According to Dr. Wood, the injuries depicted in the State's exhibits did not necessarily represent what Defendant saw Saturday, the day J.R. was injured, or Sunday morning. Taking bandages off for the first time right before the pictures were taken could have affected how the wounds appeared. Dr. Wood was asked if applying ointment and bandages and relying on a child's answers to inquiries could affect the reasonableness of the delay. Dr. Wood agreed that it could. Dr. Wood further stated, "If you're asking me, is it theoretically possible someone has a burn, that it is significant enough that they no longer have pain at the burn sight [sic], then that is theoretically possible."

Dr. Wood was questioned as follows:

Q.      If you'd been told that [J.R.]'s dad ran the water a bit too hot, unknowingly and told her, get in the tub. She gets in the tub on her own, gets out on her own, says-- he sees that there is some kind of burn, and they decide to try to treat it at home, and then as a worst case scenario, take her to the doctor on that Monday morning. If you'd been told that at the very beginning, would you have included the NTA or the NAT [non-accidental trauma] entries in your records?

A.      Yes.

Q.      You still would have.

A.      Uh-huh.

Q.      Why?

A.      Well, I' assuming you mean, actually also looking at the child, right?

Q.      Okay. Yes, sure.

A.      And I'm not talking about talking to her, . . .

Q.      Right.

A.      . . .nor looking at her injuries, 11:45, when I documented, 11:45 in the morning that she was-- to Monday morning. That story would

13

have been inconsistent, in my medical experience with her injuries, and that would have been a red flag. Even without significant delay, if there were-- that that story would have been inconsistent.

Q. In what ways?

A. That she had significant burn injuries, and yes, the ER record from Lourdes included, maybe a broad differential of things that can present as burns including chemical burns, which I don't think anyone was seriously considering either.

. . . .

A. Likewise, I don't think that-- again, my speculation may be or my medical opinion is somewhat in the, in the field, is that that, looking at that record, I don't look at that as medical provider and see in the record, and go, oh, maybe this guy was actually thinking this was a first degree burn, any more than I think that he was looking at it and thinking, maybe this is a chemical burn. I think that is, that is a reflection of some of the formalities of the medical record that may or may not actually-- which, I think, are unlikely to be documenting any medical providers [sic] opinion, as evidenced by the fact that the differential diagnosis was listed that way, that did not show up in the assessment and plan portion, where the physician was giving their opinion.

Dr. Wood further testified:

A. So to finish the question you asked me, which was, if I remember it correctly, if the story had been told to me, as you described to me, would I have still considered non-accidental trauma? The answer to that is "yes," because I don't think anyone, beginning with the very first medical provider or for that matter, in my understanding, including grandmother, mother, whoever first arrived to pick up the child, all the way until-- you know, throughout the medical record, I don't think anyone was considering this to be potentially a minor injury. I think everyone, from the moment that we became, that the medical community became aware of her, considered this to be a major injury, which prompted a call to the Regional Burn Center, which prompted photographs in the emergency room, and therefore, a story that is inconsistent with the pattern of injury, . . .

. . . .

A. . . . raises some suspicion of NAT, regardless of whether it is theoretically plausible in some sense.

Q. And regardless of whether there's sworn testimony to the contrary?

A. Sure.

14

Dr. Wood indicated that once J.R. got out of the tub, there would be visible signs of injury such that a lay person could see it was significant. He expected the level of injury would have caused significant pain on a continuing basis. He also expected J.R. to have verbally expressed her pain or at least cried on a continual basis.

Dr. Wood testified that for J.R.'s injuries, "exposure would have had to have been either very prolonged, or very hot, meaning well outside of the temperature of normal bathing temperature." Dr. Wood was asked, "would water temperature that would have to be hot enough to cause the thermal injury you saw, would that be felt by the normal person who stuck their hand in the water?" He answered affirmatively. Dr. Wood testified that "whatever blistering she was going to have, whatever skin color changes she was going to have, that those things were visible very soon." He further stated, "I think that what you see in those pictures that we looked at earlier, is the manifestation of changes that would have been immediately visible, immediately, meaning within, I would think no more than an hour." Dr. Wood was asked, based on his experience as a pediatric surgeon who treats children with burns, if a four-year-old could voluntarily withstand water hot enough to cause the burns J.R. suffered from for more than five minutes. He responded, "No."

Dr. Wood opined that J.R.'s explanation of how she got into the tub and out was inconsistent with the burn pattern. Dr. Wood explained, "part of the significance of the bilateral feet, as well as the buttocks is essentially, if you put one foot in, and it's too hot, you don't put the other foot in, and so, that would be inconsistent with voluntarily getting into the tub."

Dr. Wood also opined that at least five minutes of exposure to 120-degree water by a child would be required to have any level of burn or thermal injury. Water

at a temperature of 120 degrees would not be comfortable for anyone to even briefly put their hand in.  Dr. Wood further testified:

> [I]t is not conceivable to me, that an adult could put their hand under water, thinking it was a reasonable temperature and a child could get into it, have a prolonged enough exposure to that water, which would have to also maintain its temperature during the course of the exposure, to then result in a thermal injury that she has.  That, I think that's inconsistent.

Dr. Wood opined that 110 degree water was hotter than water that just about anyone would take a bath in.  He indicated 100 degrees would be comfortable for an adult.  Dr. Wood was asked how long it would take for a child to develop burns in 110 degree water.  Dr. Wood opined, assuming the water temperature was maintained, it would take thirty to forty-five minutes of exposure at that temperature to cause J.R.'s injuries.  Dr. Wood further testified, "to make a reasonable hot bath, meaning something that an adult would say, it's not, but it's not too hot, with an amount of exposure, time wise that would result in her specific injuries."  Dr. Wood continued:

> but for there to be a temperature, as you asked, that felt like a reasonable bath temperature, to have the amount of exposure that it would take, in my opinion, the water would have probably cooled off, . . .
>
> . . . .
>
> . . .before you got to a place, well before you got to a place that you could have the types of injuries that she had.

He did not typically see injuries resulting from malfunctioning hot water heaters.

Dr. Wood testified that he had no reason to think that a child would sit with only her ankles and lower back in the water during the course of a normal bath.  Contact with the feet and buttocks tended to indicate someone was holding the child in the bath.  Dr. Wood testified that "with the clear view marcation what she had, bilaterally and concentric," it was a classic pattern of injury for non-accidental exposure.

16

Jerome Thomas testified that Defendant was his son-in-law, and he had known him seven or eight years. Thomas had to light the hot water heater at Defendant's home around the time Defendant and his wife, Tabatha, were arrested. Defendant was at work at that time. He was called back to re-light it because it went out again. At a prior hearing, Thomas testified it had been about a month since he worked on the hot water heater.

Jahanna Collins testified she was Defendant's sister-in-law. She was employed as a medical assistant at a pediatrician's office. She then stated she was a triage nurse. When asked about her training, she stated she had worked at the doctor's office for ten-and-a-half years. Tabatha Babineaux contacted her about what type of cream to put on J.R.'s burns. There was discussion about J.R. possibly seeing the doctor she worked for. Collins told Tabatha to apply the cream "for now," but J.R. would need an appointment. Additionally, she advised Tabatha the child could probably be seen Monday. An emergency room visit was not discussed. She was not told about the extent of J.R.'s injuries. Collins testified there were no problems with Defendant abusing children.

Tabatha, Defendant's wife, had also been charged as a result of J.R.'s injuries. When she began dating Defendant, he told her he had a child in addition to the two he had with his ex-wife. Tabatha also had a daughter at that time. She and Defendant got married in March 2014. Defendant had visitation with his two sons, and Tabatha's daughter lived with them. Tabatha had a child with Defendant in July 2014. Tabatha was fine with Defendant bringing J.R. to visit.

Defendant worked offshore and did not have a set work schedule. He could be gone three weeks to three months but was home for seven days when he returned. When Defendant was home, his sons were with him. In 2014, Defendant's sons were ages seven and three, and the seven-year-old had cerebral palsy caused by

being shaken as a baby and did not walk or talk, wore diapers, and was developmentally slow. Defendant cooked for, fed, and bathed his sons. He also helped with their homework and took part in extracurricular activities. Defendant did the same for Tabatha's daughter.

Tabatha testified that between March 2014 and January 2015, J.R. visited their home three or four times. By January 2015, J.R. had not spent ten nights with them. J.R. slept in the room with Tabatha's daughter, and the room had its own bathroom. The bathroom the boys used was twelve to fifteen feet from the girls' bathroom. Defendant usually bathed his sons, but he did not bathe J.R.

Tabatha characterized J.R. as shy and standoffish, not uncomfortable. Tabatha was not aware of J.R. getting bitten by ants. There was never an incident where Defendant purposefully hurt any of their children.

Tabatha assumed Defendant came home on a Thursday in January and picked up his kids on Friday. That evening, they opened Christmas presents. There were no problems with J.R. that day. On Saturday, Tabatha's daughter had a basketball game, so she got her daughter and the baby ready. Then they left. While Tabatha was out, Defendant called inquiring when she would be home. Tabatha told him to get the three kids he was with bathed and dressed to go to spend the night with Defendant's mother, as the two had plans for the evening. Ten to fifteen minutes later, Defendant called and told Tabatha to stop at the store for something because he thought J.R. burned herself in the bathtub. Tabatha stopped for Neosporin, burn cream, and bandages then headed home. She arrived at approximately 2:00. J.R. was dressed, and Tabatha asked her what happed. J.R. responded, "'Look at my feet.'" J.R.'s feet were red, and she explained that her bath water was hot. Tabatha did not get any indication that Defendant purposefully put J.R. in hot water. J.R. stated she was okay when Tabatha asked her. Tabatha touched J.R.'s feet, and J.R.

indicated that it did not hurt. J.R. was nervous at that time. Tabatha then testified that she asked J.R., "'Did they hurt,'" and J.R. said yes. Tabatha then gave her five milliliters of ibuprofen and put Neosporin on her feet. Defendant explained what happened to J.R., and Tabatha assured him J.R. seemed okay. Defendant was nervous at that time. Tabatha did not see the need for medical treatment. She was not aware of any attempts to contact J.R.'s mother at that time.

At approximately 5:00, J.R. and one of the boys were playing with their Christmas gifts. About an hour later, Tabatha checked J.R.'s feet again, and they were warm but not tender to the touch and were not discolored. Tabatha called her sister, who worked in a doctor's office, for suggestions. Approximately an hour later, Tabatha noticed J.R.'s feet were discolored. She applied cream to J.R.'s feet and put bandages on them. She then suggested Defendant call J.R.'s mother. Tabatha never checked any other area of J.R.'s body. They cancelled their plans and stayed home with the kids. Everyone went to bed around 9:00. Sunday morning, J.R. walked to their bedroom and asked to get in bed with Tabatha and Defendant. J.R. said she was okay. By that time, J.R.'s feet had started to blister. J.R. sat at the table that morning and ate breakfast. Tabatha called her sister back, and the sister asked her to send pictures. They discussed an appointment with the doctor and the type of insurance J.R. had. Tabatha rotated cream, Motrin, and Tylenol to treat J.R.'s injuries. The discoloration was getting worse, but J.R. did not have a fever and was not in distress. Either she or Defendant suggested taking J.R. to the emergency room. Tabatha dressed her in a onesie, and they got in the car.

They arrived at Opelousas General, and J.R. was asleep. The two contemplated going in, and Tabatha made another call to her sister. Tabatha reported the blisters were getting worse but J.R. did not have a fever. Her sister told her J.R. was on the schedule to see the doctor at 8:00 Monday morning. If the child was not

running fever and "doing this," it would be okay to wait until morning. They then decided to drive home. During that drive, Defendant called J.R.'s mother and told her what happened and about the doctor's appointment. Two hours later, the mother arrived at their home. Defendant was distressed "about all of this."

When asked if J.R. cried, Tabatha testified, "I can't say she didn't shed tears. Yes, when I got home, when I got home and looked at her feet and asked her what happened, there were tears, but a panic cry that, I mean that you got different levels of crying." Tabatha characterized it as a scared cry. That was the only time J.R. was tearful.

Lieutenant Lynette Chavis spoke to J.R. on January 16, 2015, four days after the incident. J.R. reported she was playing with a LeapPad and having trouble with the letter "b." Defendant got upset and sent her to her room. Defendant entered the room while J.R. was lying on the bed. He picked her up, threw her, and choked her. J.R. then urinated on herself. J.R.'s testimony about a scooter was not consistent with what she reported to Lieutenant Chavis. Sharika gave a statement to Mitchell Doucet in which she indicated the burns were not intentional.

Lieutenant Chavis interviewed Defendant regarding the burns. He told her he ran water and J.R. got into the tub. Before J.R. got out, he saw a blister on her foot. Defendant then called Tabatha to have her bring home burn cream. Defendant stated he tested the water, and J.R. told him it was hot. Lieutenant Chavis also questioned Defendant about the hot water heater due to a previous case she had. Defendant stated there were no problems with his hot water heater. He reported taking J.R. to the hospital but not going in because Tabatha's sister said that as long as J.R. did not have a fever, it would be alright to bring her in the morning. The statement was given the day Defendant was arrested, January 20, 2015. Lieutenant Chavis also interviewed Tabatha. She never discussed the hot water heater with Tabatha.

Defendant was thirty-five years old at the time of trial. He testified that he had two sons and a daughter, and his mother lived with his family. His son was injured by the babysitter's son when he was six months old. He did not doubt J.R. was his daughter. He would pick up J.R. for visitation, and she was nervous at first. Defendant knew J.R. was bitten by ants while playing outside. Defendant denied locking J.R. in a closet. He did not recall hanging her in a closet, either. Defendant also denied biting J.R.

On January 9, 2015, Defendant had all of his kids. He bought J.R. a LeapPad for Christmas and got one of his sons a scooter. J.R. did not want to play with the LeapPad, and Defendant told her the LeapPad was the only toy they had. J.R. was not upset, and he did not get mad at her for not wanting to play with it. He previously had a conversation with J.R. about taking care of her scooter, which had been thrown away by her grandmother. This conversation did not occur the weekend J.R. was burned.

Tabatha took her kids to a basketball game. Defendant and Tabatha had plans for the evening, so he was supposed to bathe the other kids before all the kids were brought to Defendant's mother. He ran bath water for his sons. He started running J.R.'s bath water and returned to the boys. He remembered telling J.R. to take a bath. He then began bathing the boys and went back to J.R.'s bathroom and turned the water off. He then told J.R. to get ready to bathe, and she went in the bathroom. There was no indication the water was too hot for his sons. When asked if he tested J.R.'s bath water, Defendant stated, "The only thing I remember is, it's just always natural for me. When I turn it on, I just pass my hand real [sic] quick and make sure it's set, and especially at that time, I was ready to get back to the other bathroom." He did not test the water again before J.R. got in. He turned the water off and left the room. J.R. yelled to him that the water was hot, and he told her it was not and to

21

get in. Defendant then testified that his sons always said the water was hot, and their food was hot. Defendant finished washing the boys and dressed them. J.R. told him the water was hot "[m]aybe twice." Defendant stated he had never been in the bathroom with J.R. or bathed her. He further stated, "I just checked to make sure she was all right by coming to, you know, the end of the hall, and if she's not out yet, then I'm back to the boys." J.R. was getting out of the tub, and he told her where her clothes were. J.R. then dressed herself. He was not present at that time. When he saw her, she was wearing pajama pants with a long sleeve shirt.

J.R. told Defendant her feet were hot, and he saw that her feet were "pretty red." Defendant then called Tabatha and told her he thought J.R. got burned in the tub and to get something for burns. J.R. was not crying. It took Tabatha about thirty or forty minutes to get home. During the wait, J.R. sat on the sofa and watched television. She did not cry. He asked her a few times before Tabatha returned if she was okay, and J.R. indicated she was. He saw nothing Saturday evening that would lead him to believe he should take her to the emergency room. He saw blisters the next day. He texted Sherika several times, telling her she needed to call him. She was at work at that time. He called her after she got off work. He heard loud music, and Sherika said she was playing cards.

When asked if J.R. complained of pain, Defendant stated:

> I think so, I mean, that's why Tabatha had the medicine, you know, she may have, but nothing extreme to where she was just crying out loud and just, you know, nothing excruciating where she couldn't take it. You know, it was never, you know, loud in the house, where it would, you know, she was screaming and hollering that she was in extreme pain.

When asked, J.R. gave two responses–she was okay, or she was not feeling good.

Defendant testified that prior to Sunday afternoon, J.R. did not look the way she did in the State's exhibits, which show significant and severe burns on the J.R.'s

22

feet and backside. Defendant did not know why he had not taken J.R. to the emergency room as of mid-afternoon Sunday. He testified:

> I just--thought everything was . . . going to wait until Monday. I mean, it wasn't- - it didn't seem as bad as the- - it wasn't like pictures are, where you'd think- - you know, I mean, anybody would have thought, you know, to bring her then, you know, with all the blistering and all that, but I mean, like I said, the first day it was just redness, and she said she was a little uncomfortable; and then the next day, you know, I mean, we seen [sic] blisters, but it wasn't, it wasn't like the pictures the day after.

He knew about Tabatha's conversations with Collins, and they relied on what Collins said. It was his understanding J.R. was scheduled to see a doctor Monday morning. Defendant had decided to bring J.R. to the emergency room but returned home.

Defendant indicated he did not intentionally run the water too hot. He turned on both knobs. He could not say if J.R. adjusted the knobs, but his youngest son had done so before.

Defendant testified at a proceeding held on December 27, 2017. During that proceeding, he stated he "'ran this bath water the same way I thought I ran that bath water.'" Defendant thought that testifying that he passed his hand through the water to test it might have been an important fact. Defendant gave a statement to police on January 11, 2015. In that statement, he said he entered the bathroom, and J.R. was in the tub bathing. He gave a second statement to police on January 20, 2015. In that statement, Defendant said "'she was getting dressed, she said she was hot, and I saw a small blister[.]'" He further told police that the next morning the blistering was worse. Defendant disagreed with his prior statement. The statement further indicated that Sunday morning, J.R. woke up to tell him she was in pain, and the blistering was worse. In the December 27 proceeding, Defendant testified that

23

after J.R. was dressed, she told him the water was hot and he saw a blister or two on her feet.  Defendant did not recall that.

Defendant was questioned about Tabatha's testimony regarding applying cream to J.R.'s feet.  Defendant then testified that cream was applied before 7:00 p.m.

Defendant indicated that on Sunday, it was dark before he decided to bring J.R. to the emergency room.  This was after he contacted Sherika.  The blisters looked bigger, but not like in the pictures of J.R.  He did not help Tabatha dress J.R. for the trip to the emergency room.  J.R. fell asleep.  The only blisters he saw were on top of her foot.  There was one water heater in the house.

After hearing the testimony and reviewing the evidence, the trial court ruled as follows:

> First, I will for the record, make a finding that at the time of the commission of these events, the victim was four years old.  The defendant testified that today, he's thirty-five years old, which means he's either thirty or thirty[-]one at the time this happened in January of 2015.

The trial court continued:

> With regard to the charge of second[-]degree cruelty to juveniles, 93.2.3, there was a lot of evidence presented and a lot of conflicting evidence, one way or another, some by the same people who testified, but there is some very compelling testimony that influenced me greatly, and that is Dr. James Wood. Dr. Wood's testimony, is in fact one of the most important things that occurred here, along with others, but Dr. Wood was clear that despite hearing that the victim in this case testified that she put herself in the tub, that the physical signs of burn are completely inconsistent with that; and I'm sure if counsel did their own research, it wouldn't be the first time you hear that.  There have been numerous cases before where there's been testimony by a victim that, I got into the tub, but yet the medical says, no way, because the level of burns and the pattern of burns do not fit, because a child is not going to, not only not place themselves in that type of hot water, but can't consistently stay in it and if they do, are going to be moving around. Dr. Wood said that this is, in fact, a classic example of an immersion burn. I think Nurse Martin called it dipping, but that the way the burns were concentric, where they were located, clearly indicates that this was not accidental. He went on to state that the water would have been--

water hot enough to cause the burns that he treated [J.R.] for, would have been readily noticeable to an adult who placed their hand in that water while they were putting that water in the tub. He went on to state that there would be immediate visible signs of that burn after that child was taken out of that tub. While he did admit that the photographs that were taken at Our Lady of the Lourdes Hospital on Sunday night, getting very close to Monday morning, in fact, the testimony was that the photos were taken within ten minutes of arriving at Our Lady of Lourdes. Our Lady of Lourdes records, certified copy placed into the record indicates that arrival was at 23:23, which is 11:23 p.m., which means the photographs would have been taken by 11:33 p.m. on the Sunday. The testimony by Tabatha Babineaux and by Joshua Babineaux today in court, was that on Saturday, it was nothing more than red. The feet were nothing more than red, and that they didn't check anything other than the feet. However, today Joshua Babineaux on cross examination, admits that he indicated on more than one occasion that he noticed at least one blister immediately upon [J.R.] being out of the tub and just prior to her dressing, which may or not be the reason he called his wife and said, "We need something for burns," but it certainly is contradictory to what he testified to today. There was [sic] immediate signs of a significant burn that caused blistering. I also find it hard to believe that this child had these burns, played with other children in the home Saturday evening, Saturday night, went to bed and slept without a whimper, got up, walked over to the adults [sic] bedroom and climbed into bed and was complaining then. When I take the doctor's testimony into consideration that this child would have been in substantial pain, pain sufficient that the child would be crying and that the child would have difficulty even walking. The idea that we did all we could do, we took reasonable steps by getting some cream, some gauze, placing that on her foot, without ever looking at the rest of her body, knowing that she was in a bathtub, defies reason to me, and Tabatha Babineaux testified that I called my sister, Jahanna Collins, on three separate occasions, and I not only described to her what I saw, I sent her pictures. But Jahanna Collins says that she was not given any info on the extent of the burns. I not only wrote it down. I put a big square around it with a star next to it. Not knowing what Tabatha was going to testify to, it just seemed unusual that if you were seeking medical advice from someone, that you would not give them any information as to the extent. She certainly didn't testify that she was told that they noticed blisters, only relative to no fever. I don't believe Tabatha Babineaux's testimony, based upon that. Why would your own sister not support your testimony, defies logic to me. In addition to those prior statements given by the defendant to law enforcement, hand written [sic] statements that he confirmed today was his handwriting, he not only indicated that he saw blistering as early as Saturday, right before she dressed, his statement contains another statement. On the statement of January 20th, that Sunday morning the blistering was worse. You wouldn't say on Sunday the blistering is getting worse, unless you noticed blistering prior to Sunday. It defies logic to say that. Second degree cruelty to juveniles, as both counsel have advised me, and I'm reading from the 2015 Code, because that's when this occurred,

is "Second degree cruelty to juveniles is the intentional or criminally negligent mistreatment or neglect by anyone over the age of seventeen to any child under the age of seventeen." Let's stop there. I've already established that Joshua Babineaux was over the age of seventeen and certainly that [J.R.] was four. That takes care of that element, "Which causes serious bodily injury or neurological impairment to that child." By all testimony presented, by all testimony presented, both sides, there's one thing I know that is true, the only two people who were in the bathroom where [J.R.] was burned, was [sic] Joshua Babineaux and [J.R.]. There's no dispute by the defense. I'm not saying she wasn't burned there, she wasn't burned in that tub, so I can establish that the burn occurred at Joshua Babineaux's household in that bathtub, in bath water that he put in the tub, by his own testimony. Then I add to that, the doctor's testimony, which is substantiated by Nurse Martin, with regard to the pattern, and the doctor plainly stated that no child is going to put a foot in water hot enough to cause those damages and then put a second foot in. They're not going to do it, not unless they're made to do it; and if she couldn't do it voluntarily, the only other person who could have forced her to do it, was Joshua Babineaux. Therefore, I find Joshua Babineaux guilty of second[-]degree cruelty to juveniles, based upon all of the testimony presented. I also find that, as part of that finding, that the burns she sustained, do in fact meet the definition of serious bodily injury in the statute, in that they did, in fact, involve protracted and obvious disfigurement, impairment of function of a bodily member and substantial risk of death, as substantiated by Dr. Wood, due to the systemic response that she had, that there was, in fact, a substantial risk of death. I will go as far to say for the record, that even beyond that, that based upon the testimony of Dr. Wood, as to the obvious signs that would have been present immediately after getting out of the tub, combined with the statements of the defendant that he noticed blistering shortly after, that there was sufficient evidence that there was a significant injury that occurred in that bathtub, that according to Dr. Wood, that a regular adult would have noticed and would have seen to be a substantial injury. I can only conclude that the reason for not getting immediate care was self-serving by the defendant, in an attempt not to have to come forward with what happened. I can't put any other logic on it, based upon what I look at when I look at a totality of it. Did a four[-]year[-]old's testimony flip flop here, there? Yes, but there's one thing that's for sure, that this doctor basically gave me something that was uncontradicted and that is, it couldn't have happened. It could not have happened voluntarily. Therefore, I find that the elements of second degree cruelty to juveniles as contained in 14:93.2.3, have been proven beyond a reasonable doubt by the State, and I so find Joshua Babineaux guilty of same.

In brief to this court, Defendant notes J.R.'s testimony that she climbed into the bathtub on her own. He contends the State provided no direct evidence to show he intentionally placed J.R. in hot water. Despite this, the trial court concluded that

he placed J.R. in hot bath water. Defendant contends the investigation into J.R.'s allegations was not adequately done, as police did not comply with United States Department of Justice investigation techniques. There were no steps taken to investigate the hot water heater and to present evidence about its settings or the depth of the tub. Defendant further asserts the State failed to prove criminally negligent mistreatment or neglect. Defendant points to Dr. Wood's testimony that J.R. would not have been calm after the burns. However, Sherika testified J.R. was playing with toys Saturday evening, which was confirmed by Tabatha.

The version of the events J.R. gave at trial contradicted Dr. Wood's theory of how the burns occurred. However, statements made by J.R. in January 2015 validate Dr. Wood's opinion.

In *State v. Gaton*, 13-30 (La.App. 3 Cir. 6/12/13) (unpublished opinion)[3], *writ denied*, 13-1642 (La. 1/27/14), 131 So.3d 54, the defendant argued there were contradictions in the testimony presented at trial. He noted the victim, C.T., initially denied anything happened to her. She then said Danny was responsible. During a forensic interview, the victim said defendant put his penis in her vagina and digitally penetrated her. However, at trial, she stated defendant placed his penis in her mouth but did not mention the other types of sexual conduct. The victim also denied defendant placed his hands under her dress while another child testified that he saw defendant place his hands under the victim's skirt several times. The defendant further noted that during her interview, the victim stated the events occurred twenty-five times with her clothes on, and, at trial, she described one incident in which she was naked.

This court addressed the issue of contradictory evidence as follows:

---

[3]2013 WL 2494981.

The State asserts that the evidence is sufficient to support Defendant's conviction. In support of that contention, the State cites *State v. Broussard*, 95–792 (La.App. 3 Cir. 12/6/95), 664 So.2d 835. In *Broussard*, the defendant was convicted of oral sexual battery for performing oral sex on the six-year-old victim and making her perform oral sex on him. On appeal, the defendant argued that because the victim's sworn testimony at trial and her unsworn testimony in a videotaped interview conflicted, the sworn testimony should prevail.

In her videotaped statement, the victim in *Broussard* stated that, while in the rocking chair, the defendant made her suck his bottom and he licked hers. At trial, the victim testified the defendant merely kissed her while they were in a rocking chair. The victim's mother testified that the victim told her the defendant made her suck his penis while they were on a reclining chair. This court found the evidence, when viewed in a light most favorable to the prosecution, showed the defendant made the victim perform oral sex. This court further found:

> We decline Broussard's invitation to review the jury decision and accord greater weight to T.C.'s trial testimony. The jury was free to ascribe T.C.'s trial testimony whatever weight it judged reasonable, or none "at all" if it found T.C.'s taped testimony and the recollection of her mother were more credible and accurate. The record supports the jury's findings, and we will not reevaluate the credibility of the witnesses. *See State v. Pontiff*, 604 So.2d 71 (La.App. 3 Cir.1992).

*Id.* at 840.

In *State v. Simmons*, 03–20 (La.App. 5 Cir. 4/29/03), 845 So.2d 1249, the defendant was convicted of aggravated rape and aggravated crime against nature. On appeal, the defendant argued the victim's testimony was unreliable, as there were inconsistencies in her testimony. On appeal, the fifth circuit noted:

> Although there may be slight inconsistencies in minor details of the events surrounding her attack, the child never wavered in her statementto [sic] her mother, Officer Carrone, Dr. Benton, Omalle Gordon, and, finally, at trial—that defendant put his "thing" in her mouth and "down there," i.e. in her vagina. Further, the alleged discrepancies are not necessarily indicative of untruthfulness or incompetence. Rather, memory lapse and alleged inconsistencies may have resulted from the child's tender age—5–years–old—on the date of the incident; the traumatic nature of the experience; exposure to unfamiliar surroundings; or the method of interrogation. *See, State v. Foy*, 439 So.2d 433, 434 (La.1983).

*Id.* at 1258.

. . . .

In *State v.C.S.* [sic], 10–507 (La.App. 3 Cir. 11/17/10), 50 So.3d 983, the defendant was convicted of the aggravated rape of his six-year-old daughter. On appeal, the defendant implied the victim's testimony was not credible because she had changed her accusation of who abused her several times. The defendant filed a complaint with police alleging his former girlfriend's brother had abused the victim. After the victim was removed from the defendant's custody, she stated the defendant abused her, and she consistently maintained that position through the trial. In affirming the defendant's conviction and sentence, we stated:

> In *State v. Rideaux*, 05–446, p. 2 (La.App. 3 Cir. 11/2/05), 916 So.2d 488, 491, this court quoted the following ruling in *State v. Roca*, 03–1076, pp. 11–12 (La.App. 5 Cir. 1/13/04), 866 So.2d 867, 874, *writ denied*, 04–583 (La.7/2/04), 877 So.2d 143, which in pertinent part stated: "In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual finding."
>
> Considering the evidence in a light most favorable to the prosecution, sufficient evidence exists to sustain the verdict of aggravated rape of a child under the age of thirteen years.

*Id.* at 986.

In *State v. Waguespack*, 06–410 (La.App. 3 Cir. 9/27/06), 939 So.2d 636, the defendant was convicted of aggravated rape. On appeal, this court, after recognizing that there were inconsistencies in the versions of events given by the victim at the emergency room, the advocacy center, and at trial, stated:

> T.B.'s testimony may be clearer than her initial reports due to her inexperience with sexual activity.
>
>> Furthermore, "[t]he fact that the record contains evidence which conflicts with the testimony accepted by the trier of fact does not render the evidence accepted by the trier of fact insufficient." *State v. Holley*, 01–0254, p. 6 (La.App. 3 Cir. 10/3/01), 799 So.2d 578, 583, *citing State v. Tompkins*, 403 So.2d 644 (La.1981), *appeal after remand*, 429 So.2d 1385 (La.1982).
>
> *State v. Schexnaider*, 03–144, p. 9 (La.App. 3 Cir. 6/4/03), 852 So.2d 450, 456–57.

*Id.* at 642–43.

  In the instant matter, the jury heard the inconsistencies detailed during C.T.'s interview and her testimony at trial. C.T. merely mentioned Danny once during her interview and never referred to him again. C.T. reported to her mother and Joseph[, the forensic interviewer,] that the acts were committed by Defendant and testified in the same manner at trial. The jury, as the trier of fact, was free to accept any part of C.T.'s testimony. The jury could have determined that, as in *Simmons*, 845 So.2d 1249, . . . , any inconsistencies in C.T.'s claims were due to C.T.'s age at the time of the offense. The verdict clearly indicates the jury chose to believe Defendant committed the acts against C.T. That credibility determination should not be second-guessed by this court. Based on the decisions cited herein, the evidence was sufficient to support Defendant's conviction, as C.T. stated during her interview and at trial that Defendant placed his private in her mouth. Accordingly, Defendant's first assignment of error lacks merit.

*Id.* at pp. 5-8.

Defendant's trial testimony suggested as a reasonable hypothesis of innocence that J.R. had accidentally injured herself. His version of the events was corroborated by J.R.'s testimony. The trial court's reasons for rendering the verdict of guilty of second degree cruelty to juveniles clearly state that it found Defendant's testimony and that of J.R. confirming his version of the events unbelievable.

In a statement to Detective Reed on January 19, 2015, approximately nine days after she was burned, J.R. said Defendant put hot water on her back and leaned her against it. J.R.'s statement was substantiated by Dr. Wood's opinion that J.R.'s injuries were the result of non-accidental trauma. Dr. Wood also indicated that the pediatric critical care physician who did the initial consultation described J.R.'s burns as a classic dip pattern of thermal injury. Nurse Martin also described J.R.'s burns as "a dip." The discharge summary from Baton Rouge General stated, "This is a 4-year-old female who initially presented after mom picked up child from her father's house where patient reports that he had dipped her in hot water." This

evidence, which was clearly believed by the trier of fact, proves beyond a reasonable doubt that Defendant intentionally placed J.R. in hot water.

J.R. had deep partial and full thickness burns on ten to fourteen percent of her body. As a result, skin grafts were done to both feet and ankles and her lower back. These injuries satisfy the requirement that J.R. suffered serious bodily injury at the hands of Defendant.

For these reasons, Defendant's conviction is affirmed.

## EXPERT TESTIMONY

In his second assignment of error, Defendant contends the trial court erred by placing too much weight on Dr. Wood's expert testimony to find him guilty of second degree cruelty to a juvenile.

Defendant contends Dr. Wood did not use many of the routine assessments of burn patterns that are noteworthy in determining whether a burn is a non-accidental trauma, including sparing. Additionally, Defendant argues that Dr. Wood's testimony was problematic because he placed too much emphasis on the presumption that a child who gets into hot water will not remain in the hot water due to discomfort and did not consider other subjective factors that could have influenced J.R.'s decision to remain in the hot water. Defendant further asserts Dr. Wood's inferences and opinions regarding the intentionality of J.R.'s injuries were abstract and indirect and related to an ultimate issue. Thus, the trial court placed too much weight on Dr. Wood's opinion that Defendant held J.R. in the hot water. Defendant contends there were other reasonable theories as to what occurred that raise a reasonable doubt, including J.R. was so afraid of Defendant and her new environment that she did not want to exit the hot bath after entering it. Therefore, the trial court should not have found beyond a reasonable doubt that Defendant intentionally placed J.R. in the hot bath water.

Defendant alleges Dr. Wood's testimony related to an ultimate issue. Dr. Wood never specifically testified that Defendant held J.R. in the water. Defense counsel objected when the trial court questioned Dr. Wood about the water temperature and the length of exposure to the water. Defense counsel additionally objected on the basis of leading when the trial court asked Dr. Wood whether a child could withstand putting a second foot into the water. However, he did not object when the trial court asked whether a four-year-old child could voluntarily withstand water hot enough to cause J.R.'s burns for five minutes or more or when Dr. Wood testified that J.R.'s injuries were caused by non-accidental trauma. A new basis for objection cannot be raised for the first time on appeal. *See* La. Code Crim.P. art. 841.

In *State v. Lemoine*, 14-1158, p. 20 (La.App. 1 Cir. 9/26/17), 232 So.3d 637, 650, the court addressed the weight to be given testimony by the trier of fact as follows:

> The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. Moreover, when there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. The trier of fact's determination of the weight to be given evidence is not subject to appellate review. An appellate court will not reweigh the evidence to overturn a fact finder's determination of guilt. *State v. Taylor*, 97-2261 (La. App. 1st Cir. 9/25/98), 721 So.2d 929, 932. We are constitutionally precluded from acting as a "thirteenth juror" in assessing what weight to give evidence in criminal cases. See *State v. Mitchell*, 99-3342 (La. 10/17/00), 772 So.2d 78, 83. The fact that the record contains evidence that conflicts with the testimony accepted by a trier of fact does not render the evidence accepted by the trier of fact insufficient. *State v. Quinn*, 479 So.2d 592, 596 (La. App. 1st Cir. 1985).

The trial court's evaluation of the credibility of Dr. Wood's testimony was within its discretion as the factfinder.

This assignment of error lacks merit.

**EXCESSIVE SENTENCE**

In his third assignment of error, Defendant contends the trial court erred in excessively sentencing him to five years at hard labor for his first felony conviction.

Defendant was convicted of second degree cruelty to juveniles, which is punishable by imprisonment at hard labor for not more than forty years. La.R.S. 14:93.2.3. Defendant was sentenced to serve five years at hard labor.

Defendant introduced a transcript of the prior testimony of Jessalyn Crossley as Defense Exhibit 1. Jessalyn was the mother of Defendant's two sons. She discussed Defendant's interaction with his sons and his work schedule. Jessalyn had no concerns about Defendant being abusive toward their children. Jessalyn spoke to her sons about the burn incident. They told her they heard screaming in the house, and they could not sleep because J.R. cried that night.

Tabatha Babineaux had been married to Defendant for four-and-a-half years. She discussed Defendant's children and his interaction with them. While Defendant had his sons, he would drive them from his home in Sunset back and forth to school in Breaux Bridge. Defendant accommodated his son. He co-parented with Jessalyn in a cordial manner. He treated Tabatha's daughter like the other children. She further discussed Defendant's relationship with the daughter they shared. Tabatha testified regarding fifteen photographs admitted as Defense Exhibit 2. These photographs were of Defendant and his children. Tabatha also discussed Defendant's work history, noting he was the sole provider for their family. Tabatha claimed she would have to work three or four jobs to provide for the family in Defendant's absence. After the incident, their children were removed from the home for sixty-two days. During that time, she and Defendant went through training, counseling, anger management, and parenting courses. Defendant also had to see a

33

psychologist for a year. She had no concerns about Defendant being abusive to children in their household in the future.

Defendant stated he was sorry for the pain J.R. and her family experienced. He confirmed that he had attended anger management and completed parenting classes. He had also attended private sessions with a counselor for a year. The programs were ordered by the court. The mother of his sons, Jessalyn, died on January 12, 2018. Custody of his sons had been an issue since June 2018. A court in Monroe granted him supervised visitation. Defendant reiterated that he was sorry for what happened, and it was an accident. He indicated his family would suffer if he was incarcerated. Additionally, his mother could not work and was living with him.

Sherika Roberts testified the events were stressful for her, she had to undergo counseling, and she still could not work. She lost her car and her job. She indicated J.R. refused to wear shorts or a bathing suit and participate in different activities. Sherika noted that as a result of her injuries, J.R. had to learn to walk again. J.R. was also mentally disturbed as a result of the events. Defendant did not contact her after the incident. Sherika stated that imprisoning Defendant would be justice for her daughter.

Jessie Crossley testified that Jessalyn was his daughter, and she died January 12, 2018. He had custody of his grandsons, Defendant's children. He testified regarding his custody battel with Defendant.

After hearing testimony and arguments from counsel, the trial court stated he had considered the sentencing guidelines. The trial court noted that Defendant had no prior criminal record. It further addressed the credibility of Defendant and his wife, stating he felt there was a "reaction" by Defendant and his wife to try to cover up "this whole thing." However, in doing so, J.R. did not receive the medical care

34

she should have received immediately. The trial court further commented on testimony that Defendant and his wife actually drove to the hospital but did not take J.R. in because she was asleep. The trial court stated its credibility determinations were bolstered by the testimony of Jessalyn Crossley that her children stated J.R. cried so much the day she was burned they could not sleep. The trial court noted it was not prohibited from suspending Defendant's sentence and placing him on probation. He then pointed out that second degree cruelty to juveniles was a crime of violence. The trial court declared:

> [T]he actions by the defendant, in failing to provide immediate professional medical care to the victim in this case, manifested deliberate cruelty. I do find that the defendant knew or should have known that this victim, being a four year old child, was incapable of getting help for herself therefore, that fell upon him, and he failed to do it. And while the defendant, today, expressed remorse for what happened to [J.R.], the victim, I didn't hear "I'm sorry, I should have done the following, I should have gotten help earlier. I should have done this, I should have done that." I didn't hear that. I didn't hear it at trial for sure. I think the defendant wants everyone to believe this was just a horrible accident, and he's sorry that it happened. I think it's much more than just an accident, and that's why I convicted him. . . . And certainly, while any sentence involving incarceration of this defendant will cause rippling effects to this family, that is true anytime we sentence somebody to incarceration, and that while it's a factor, it's not a controlling factor for me.

At the time the sentence was imposed, defense counsel entered a general objection thereto, and no motion to reconsider sentence was filed. In *State v. Barling*, 00-1241, 00-1591, pp. 10-11 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1041-42, *writ denied*, 01-838 (La. 2/1/02), 808 So.3d 331, this court discussed the review of sentences in such cases as follows:

> The failure to timely file a written motion to reconsider sentence or to orally urge any specific ground for reconsideration at sentencing precludes a defendant from objecting to the sentence imposed. *State v. Moore*, 98–1423 (La.App. 3 Cir. 3/3/99); 734 So.2d 706. *See also State v. King*, 95–344 (La.App. 3 Cir. 10/4/95); 663 So.2d 307, *writ denied*, 95–2664 (La.3/15/96); 669 So.2d 433. La.Code Crim.P. art. 881.1 (emphasis added) serves as the basis for this restriction and provides, in pertinent part:

35

A. (1) Within thirty days following the imposition of sentence or within such longer period as the trial court may set at sentence, the state or the defendant may make or file a motion to reconsider sentence.

(2) The motion shall be oral at the time of sentencing or in writing thereafter *and shall set forth the specific grounds on which the motion is based*.

. . . .

D. Failure to make or file a motion to reconsider sentence *or to include a specific ground upon which a motion to reconsider sentence may be based, including a claim of excessiveness, shall preclude the state or the defendant from raising an objection to the sentence or from urging any ground not raised in the motion on appeal or review*.

In cases where courts have held that an oral objection alone is sufficient to preserve the issue for review, the oral objection contained the basis for the motion, such as excessiveness of sentence. *See State v. Caldwell*, 620 So.2d 859 (La.1993); *State v. Trahan*, 98–1442 (La.App. 4 Cir. 12/1/99); 752 So.2d 921. Therefore, since Defendant's oral motion did not set forth any specific grounds to support his claim of excessive sentences, we are relegated to a bare claim of excessiveness. *State v. Mims*, 619 So.2d 1059 (La.1993), *after remand*, 626 So.2d 856 (La.App. 2 Cir.1993), *writ denied*, 93–2933 (La.2/11/94); 634 So.2d 373.

Because defense counsel entered a general objection in this matter, this court's review is relegated to a bare claim of excessiveness.

La. Const. art. I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Etienne*, 99–192 (La.App. 3 Cir. 10/13/99); 746 So.2d 124, *writ denied*, 00–0165 (La.6/30/00); 765 So.2d 1067. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v. Cook*, 95–2784 (La.5/31/96); 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).

*Id.* at 1042-43 (alteration in original).

> In deciding whether a sentence is shocking or makes no meaningful contribution to acceptable penal goals, an appellate court may consider several factors including the nature of the offense, the circumstances of the offender, the legislative purpose behind the punishment and a comparison of the sentences imposed for similar crimes. *State v. Smith*, 99-0606 (La.7/6/00); 766 So.2d 501.

*State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-562 (La. 5/30/03), 845 So.2d 1061.

As for the nature of the offense, Defendant contends that because J.R. testified he did not place or hold her down in the hot water, the nature of the crime did not warrant a sentence of five years. Defendant's assertion ignores J.R.'s statement to Detective Reed that Defendant put hot water on her back and leaned her against the hot water, and the testimonies of Dr. Wood and nurse Martin.

Regarding the circumstances of the offender, Defendant asserts he had no prior convictions and was a model citizen and father. Defendant alleges he remained out on bail during the four years it took to proceed to trial and had no subsequent arrests or violations. Thus, he has demonstrated his ability to be rehabilitated. Defendant further points out he was a doting and involved father and husband and worked hard to provide for his family. He further asserts he expressed remorse for what J.R. has gone through.

Defendant declares a review of sentences in other second degree cruelty cases is not particularly helpful, as those cases generally involve prior convictions, continued abuse or neglect, and death. Defendant's assertion is correct. However, in *State v. Conway*, 50,596 (La.App. 2 Cir. 5/18/16), 196 So.3d 635, the defendant's two-year-old daughter suffered second and third degree burns to both legs and a cut over her left eye. The child also had other injuries to her liver, face, and head. When questioned, the defendant stated that two nights before, she had run some water in

the bathtub, and without checking the temperature of the water, she put the child in the bathtub. When she realized the water was too hot, she took the child out of the bathtub, and the child slipped and hit the side of her head on the toilet, causing a cut above her left eye. Although the defendant initially stated that she took the child to the hospital for medical treatment, the defendant later admitted that she did not take her to the hospital and claimed that she treated the burns herself. The defendant entered a plea to second degree cruelty to juveniles with a sentencing cap of twenty years at hard labor. The remaining charge of second degree battery was dismissed. The court sentenced the twenty-five-year-old first offender to fifteen years at hard labor. Considering the facts of the case and the benefit received from the plea bargain, the second circuit affirmed the defendant's sentence.

Second degree cruelty to juveniles was enacted in by 1999 La. Acts No. 191, § 1. Prior to that time, such acts as that committed by Defendant could have been charged as cruelty to juveniles, which is punishable by a fine of not more than one thousand dollars or imprisonment with or without hard labor for not more than ten years, or both. La.R.S. 14:93.[4] We will now address excessive sentence claims for burns charged under La.R.S. 14:93, which may be helpful to this excessive sentence analysis despite the fact that the sentencing rage differs from that of La.R.S. 14:93.2.3.

In *State v. Stevens*, 532 So.2d 197 (La.App. 3 Cir. 1988), *writ denied*, 541 So.2d 852 (La.1989), the defendant, who was the father of the three-year-old victim,

---

[4]The pertinent portion of La.R.S. 14:93 provides:

A. Cruelty to juveniles is:

(1) The intentional or criminally negligent mistreatment or neglect by anyone seventeen years of age or older of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to said child. Lack of knowledge of the child's age shall not be a defense[.]

was sentenced to five years at hard labor after being convicted of two counts of cruelty to juveniles, with both sentences to run concurrently. His convictions arose because he had placed his child in bath water he knew was too hot as punishment for the child having soiled her clothes. Fifteen to thirty seconds in the water resulted in second and third degree burns to the child, which he did not seek treatment for until four days later. There were other prior acts of abuse. This court found the sentences were not excessive.

In *State v. Morrison*, 582 So.2d 295 (La.App. 1 Cir. 1991), the defendant was convicted of cruelty to juveniles for burning a three-year-old child with hot bathwater, inflicting second and third-degree burns over approximately thirty percent of the child's body, because the child soiled his clothing. The first circuit affirmed the first offender's nine-year sentence.

Based on the circumstances of the offense and the cases cited herein, we cannot say the trial court abused its discretion in sentencing Defendant five years at hard labor. Thus, this assignment of error lacks merit.

## DECREE

Defendant's conviction and sentence are affirmed.

**CONVICTION AND SENTENCE AFFIRMED**.