STATE OF LOUISIANA

VERSUS

PHILIP BRIDGEWATER

NO. 22-KA-517

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 18-6796, DIVISION "B"
HONORABLE R. CHRISTOPHER COX, III, JUDGE PRESIDING

April 26, 2023

**MARC E. JOHNSON**
**JUDGE**

Panel composed of Judges Marc E. Johnson,
Robert A. Chaisson, and Stephen J. Windhorst

**AFFIRMED;**
**REMANDED FOR CORRECTION OF THE UCO**
    **MEJ**
    **RAC**
    **SJW**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Jalisa Walker
Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
     Honorable Paul D. Connick, Jr.
     Thomas J. Butler
     Andrea F. Long
     Laura S. Schneidau
     Zachary L. Grate

COUNSEL FOR DEFENDANT/APPELLANT,
PHILIP BRIDGEWATER
     Bruce G. Whittaker

**JOHNSON, J.**

Defendant, Phillip Bridgewater, appeals his conviction of and sentence for one count of sexual battery upon a juvenile under the age of thirteen in violation of La. R.S. 14:43.1.  For the reasons that follow, we affirm defendant's conviction and sentence.

## FACTS AND PROCEDURAL HISTORY

On May 29, 2019, Defendant, Philip Bridgewater, was charged by bill of information with count one - sexual battery upon a juvenile under the age of thirteen, and count two - indecent behavior upon a juvenile under the age of thirteen, in violation of La. R.S. 14:43.1 and 14:81. He was arraigned and pled not guilty on October 18, 2019. A few months prior to trial, the district court heard Defendant's Motions to Suppress Statement and Evidence. After having taken the matters under advisement, the district court denied both motions on March 24, 2021. Trial commenced on July 25, 2022 before a jury of twelve members. On July 28, 2022, the jury found Defendant guilty as charged on count one, and not guilty on count two, by unanimous vote. The next day, Defendant filed a Motion for New Trial and a Motion for Post Verdict Judgment of Acquittal.  The court denied both motions after a hearing on August 25, 2022.

Also, on August 25, 2022, the district court heard four victim impact statements-- one given by the victim's mother, and another from the victim, Q.B., which was read into the record.  Two other statements in support of Q.B. were given by the Defendant's ex-wife and another member of his family.  Defendant submitted a letter he wrote along with other letters in support of him to the court. After the defense waived sentencing delays, the court sentenced Defendant to imprisonment at hard labor for thirty years, all to be served without benefit of parole, probation, or suspension of sentence, with credit for time served.  The

Notification and Registration of Sex Offender process was completed, and Defendant was advised of his right to appeal and seek post-conviction relief.

The following facts were developed at trial through testimony and admitted evidence:

One evening in October 2018, the victim Q.B.[1], who was born in 2008 and ten years old at the time, was clingy and very affectionate with her mother, M.C. After M.C. retired for the night, Q.B. came into her room and said that she wanted to stay home and that her stomach hurt. M.C. had Q.B. lay down next to her and she described Q.B. "kind of like shrinking into [her]." Q.B. initially denied that something had happened to her when asked. After her denial, Q.B. told her mother that she would tell her "if somebody touched you or anything" when her mother asked. Q.B. then disclosed what happened and started to cry.

Q.B. told M.C. that "[D]addy touched me." She described Defendant "putting his tongue down her throat" and touching her chest and genitals. She also told her mother that Defendant held her down and she tried to make him stop. When Q.B. asked her father what he was doing, he told her that he "could love her better that way." Q.B. denied that the disclosure was the first time it happened, or that the abuse began that year. M.C. established a timeline of incidents by asking Q.B. about whether the abuse occurred when she had certain teachers. Q.B. told her that Ms. Gum was her teacher when the abuse started. Ms. Gum was Q. B.'s first grade teacher. Q.B. also told her mother that the abuse occurred in "the quiet room" in the house on Cleveland Place in Metairie, where her father lived with his

---

[1] In the interest of protecting minor victims and victims of sexual offenses as set forth in La. R.S. 46:1844(W)(3), the judges of this Court have adopted a policy that this Court's published work will use only initials to identify the victim and any defendant or witness whose name can lead to the victim's identity (*i.e.*, parent, sibling, or relative with the same last name as the victim). *State v. Mesa*, 18-526 (La. App. 5 Cir. 11/27/19), 287 So.3d 89, n.1, *writ granted, cause remanded,* 19-1908 (La. 6/3/20), 296 So.3d 1044, and *on reconsideration,* 18-526 (La. App. 5 Cir. 9/9/20), 303 So.3d 411.

wife, and the night before she and her siblings returned home was the last time it happened.

M.C. stopped questioning Q.B. because she did not "want to keep pressing her [. . .] she was already crying." Q.B.'s mother held her until she fell asleep. The mother called her sister to come over, then called her attorney. Her attorney advised her to take Q.B. to Children's Hospital in New Orleans, which she did the following morning.

Q.B. spoke to the providers at Children's Hospital by herself. Those providers referred the family to the Audrey Hepburn Care Center, and Q.B. was seen there on the same day. A doctor spoke to the family and then took Q.B. to another room for a private interview. A detective spoke to M.C. in the meantime. M.C. also spoke to Dr. Neha Mehta separately. M.C. was present when Q.B. underwent a physical examination.

On October 22, 2022, five days later, M.C. spoke to Detective Judd Harris with the Jefferson Parish Sheriff's Office ("JPSO"). JPSO referred the family to the Children's Advocacy Center where Erika Dupepe conducted a forensic interview of Q.B. At least two of Q.B.'s siblings were also interviewed at the CAC. M.C. denied observing the interview, or watching it at a later date. The mother also denied asking Q.B. about the interview process – she "wanted to make sure it wasn't tainted in any kind of way." She also did not want to add the number of times Q.B. would have to explain what happened to her. Other than for trial preparation the week before, M.C. only spoke to, or met, the assistant district attorneys periodically to touch base about the status of the case. She also did not speak to her attorney about the case at all, other than initially asking for advice on how to handle the situation. During Q.B.'s therapy sessions, M.C. sat in the waiting room. M.C. obtained a protective order so Q.B. and her siblings would not have to visit with Defendant after Q.B.'s disclosure. M.C. denied discussing the

matter with Q.B. in the time period between the visits to Audrey Hepburn Care Center and the CAC. She only told Q.B.'s siblings that they could not see their dad, but did not tell them why.

M.C. testified at trial that, prior to the incident, she did not want to keep Q.B, or her siblings, away from Defendant, because she only saw her father during summers as a child, and she wanted better for her children. She and Defendant, who was born in July 1986, met as teenagers before Katrina and started a romantic relationship a few years after. Q.B. was born in 2008, and her siblings were born in 2009 and 2010. The couple separated in 2014, but agreed to joint custody without court intervention until August or September of 2018. M.C. acknowledged that Defendant later married a psychiatrist, and that the couple had a child together. She averred that she told her children to call their stepmother "whatever they felt comfortable calling her" and denied telling the children that they did not have to acknowledge Defendant's youngest child as their sister. M.C. testified that Q.B. participates in the gifted and talented program, and she never saw or learned of any change in Q.B.'s grades or behavior at school.

Sergeant Judd Harris worked in the personal violence unit at JPSO from 2015 – 2019. As the lead detective on the case, he responded to a dispatch to the Audrey Hepburn Care Center on October 22, 2022. After speaking to M.C. and Dr. Mehta and reviewing Q.B.'s CAC interview recording, he issued an arrest warrant for Defendant. Sgt. Harris also authored and executed the search warrant for Defendant's home at 5505 Cleveland Place in Metairie. While there, JPSO took pictures of the home, including "the quiet room" Q.B. described. The pictures were entered into evidence, along with a copy of the recorded interview Sgt. Harris conducted with Defendant (which was shown to the jury), and photographs taken of the contents of Defendant's phone. One of the texts shown to the jury was a

request from Q.B. to Defendant to sleep in the quiet room on Saturday, October 6, 2019.

On cross-examination, Sgt. Harris acknowledged that he never actually spoke to the victim during the course of his investigation. Also, Defendant voluntarily came down to the station and allowed him to search his phone and take photographs. No clothes or linen were searched or taken from the home and JPSO did not use a blacklight to search for biological matter on the home's surfaces. Thirteen days lapsed between the last alleged incident of abuse and JPSO's search of the home. At the end of his testimony, the district court admitted two copies of Defendant's recorded statement wherein he denied the allegations against him; the redacted copy was published to the jury.

The district court recognized Dr. Neha Mehta as an expert witness in child abuse pediatrics. On October 11, 2018, she provided care to Q.B. A copy of the medical records that were generated during Q.B.'s visit was entered into evidence. Dr. Mehta explained that children who have been abused "can present a variety of ways" and it is not easy to tell whether they have been abused based on their appearance or (adaptive) behavior. Also, "if the child feels safe and if they feel supported, in general, most children will disclose further information as time goes on[ . . . ] as they spend less and less time with the person abusing them [. …] Disclosure is a process."

Dr. Mehta further explained that it was unusual for a child to say something the first time something happens and not uncommon for an abused child to delay their disclosure. Dr. Mehta testified:

> [T]he younger you are the first time something happens, the less
> ability you have to understand what it means[.]
> [ . . . ]
> As children get older, if they're aware that there's a problem
> here, they're often embarrassed and it's their own internal dialogue
> that's stopping them: Is it my fault that this happened; will people

think bad about me; I don't have the vocabulary to explain what's happening, I don't even know all the words for what this is.

A variety of barriers. Is my mom going to believe me; will we become homeless; am I going to be getting my relative in trouble; am I going to get in trouble. So these sort of internal messages that children tell themselves are a huge barrier and usually the main things that children describe to me as a reason they were reluctant to say anything.

And then it is also possible that children have been told not to tell. So in some cases, someone says, don't tell anyone about this or you're going to get in trouble or things of that nature.

Q.B. met with Dr. Mehta shortly after the emergency department identified the need for an acute medical evaluation. The doctor's impression of Q.B. was that "[s]he had a good vocabulary for her age and good communication skills." She noted that when Q.B. discussed a topic she was comfortable with she was "clearly articulate and answer[ed] questions in detail and length." As Dr. Mehta "moved to topics that were more sensitive, she became more quiet, more hesitant to answer. She frequently stated that she was feeling anxious. She was feeling uncomfortable. This was something she really didn't want to talk about, but she was still able to answer questions appropriately."

Q.B. told Dr. Mehta that the abuse had happened more than one time; the last incident of abuse was about 48 hours before they met; Q.B. had been sleeping in a quiet room; Defendant "had been touching her." Q.B. told the doctor that Defendant told her that he would stop before and said that he would not do it anymore, "but he did; and he told me he would love me better." Q.B. also described abuse on top of and underneath her clothes, and previous incidents involved touching inside of the underwear, and Defendant touching the skin of her chest, vagina, and buttocks area. Q.B. told the doctors that the abuse started when she was five years old and the abuse occurred in previous apartments the family lived in besides the Cleveland Place address. Since Q.B.'s visit to the Care Center was within 72 hours of the last incident of abuse, swabs from the body were

collected for an evidence kit to look for DNA; Dr. Mehta testified that she was not expecting to find any DNA evidence. Q.B. told Dr. Mehta the abuse "was gross, that she was embarrassed by it, that she didn't want to talk about it." Q.B. also expressed concern that her disclosure would cause her mother to view her differently.

Dr. Mehta did not have any concerns that Q.B. had been coached, and her diagnosis was that Q.B. presented consistently with child sexual abuse. She also examined Q.B.'s younger sister closest in age. That child did not make a disclosure of sexual abuse but was aware of the allegations against Defendant (that he had touched her sister inappropriately).

Dr. Marcela Zozaya of the JPSO Crime Laboratory, an expert in the field of forensic DNA analysis testified that some of the samples from Q.B.'s collection kit tested negative for seminal fluid, semen, or DNA. Because the most probative samples from the areas of the body that were mentioned in the last reported instance of abuse tested negative, the rest of the samples were not tested. Dr. Zozaya also stated that it would be unlikely to detect male DNA from the swabs if 72 hours had passed since the last physical contact and detection became "less likely the more time that passes."

Erika Dupepe is the executive director of Jefferson Parish's Child Advocacy Center, and a former full-time forensic interviewer. She explained the process used to conduct Q.B.'s forensic interview and the steps taken to maintain neutrality, and not to lead a child to make a particular statement. The video and a redacted copy of the video recording of Q.B.'s CAC interview was published to the jury. The State stipulated that Q.B.'s eight-year old siblings made no disclosures during their interviews.

Q.B. was fourteen years old at the time of the trial. She was preparing to enter the ninth grade and also continue participating in a gifted arts program. She

identified pictures of the house on Cleveland Street and the quiet room. The last time Q.B. was in the house, she and one of her siblings were having a sleepover in the sibling's room. She woke up really late to her father touching her in between her legs. She pretended to be asleep, but observed Defendant touching her when she was peeking. Q.B. did not remember whether the touching was on her skin, or her clothes, but she felt "uncomfortable." She pushed him away, but Defendant pushed her back down. Defendant apologized when she started to cry. Sometimes the abuse in the house in Metairie occurred while she was staying in her sister's room on the top bunk bed. Q.B. recalled her father rubbing and feeling her breasts or "butt cheeks" during other incidents. She also recalled falling asleep in the gym while playing and waking up to "[Defendant . . .] touching me again between my legs and the handcuffs were on me above my head[,]" with her pants and underwear removed.

Q.B. also recalled the first time her father touched her inappropriately. She recalled that they lived at a house at 1400 Vespasian Street. She was playing a video game with her siblings and her father called her to a dark room with the lights off, where her mother, who was at school at the time, would sleep. She also recalled instances where her father would molest her while standing on the ladder of the bunk bed while her siblings were in the room. She estimated that occurred a total or five or six times. Defendant told Q.B. not to tell her mother or he would get in trouble. Q.B. also recalled an incident where she was sleeping and then felt Defendant "trying to kiss [her] lips and feeling his tongue in [her] mouth."

Q.B. testified that she told her mother after she went to hang out in her mother's room because she was having trouble sleeping. Her mother made her promise to tell if anything was wrong, and then she disclosed the abuse. She was nervous and scared that her mother would hate her or blame her for what happened. Q.B. remembered crying a lot and her mother comforting her. She

hoped that she would not have to go to Defendant's house anymore, so she would not be hurt again and her father would not find out that she told her mother what was happening. She recalled that she told her mother at nighttime and her mother called someone afterwards. She also remembered going to the clinic to get a checkup and going to a place to get therapy. Q.B. remembered the forensic interview and watched the videotape with the assistant district attorney to prepare for trial. She told the assistant district attorney that she did not want her mother present when she testified, in case she said something her mother had not heard previously.

Q.B. never screamed or yelled while she was being molested and her siblings never woke up during any of the instances of abuse. She never discussed the abuse with any of her siblings because she did not want them to think of her differently either. She spoke to her mother about the abuse in general terms after she completed therapy. Q.B. maintained that no one gave her the impression that she had to describe anything that did not happen or exaggerate details about the abuse.

The trial ended on July 28, 2022 after three days of testimony. The jury unanimously found Defendant guilty as charged on count one, and not guilty on count two.

On July 29, 2022, Defendant filed a Motion and Incorporated Memorandum for New Trial and a Motion for Post Verdict Judgment of Acquittal. The trial court considered and denied the motions at the beginning of the sentencing hearing held on August 25, 2022. M.C. read Q.B.'s and her own victim impact statements in open court. The judge noted that he read letters that Defendant's ex-wife and niece sent to an assistant district attorney on the case, and all four letters were filed into

the record under seal.[2]  Letters from Defendant, three of his siblings, his sister-in-law, and cousin were also filed into the record on his behalf. The judge advised Defendant that he also read those letters.  After Defendant waived delays, the trial court sentenced him to thirty years at hard labor without benefit of probation, parole, or suspension of sentence.

The district court advised that it denied Defendant's motions for post verdict judgment of acquittal and for new trial because it disagreed with the assertion that the verdict rendered by the jury was contrary to law and that the jury correctly found the factual elements of guilt were proven beyond a reasonable doubt and Defendant did commit the crime he was charged with: sexual battery upon a victim under the age of thirteen as defined by R.S. 14:43.1 C(2).  The judge noted that the statute provided a mandatory minimum sentence.  After a discussion of factors provided by La. C.Cr.P. art. 894.1 that were considered, the district court sentenced Defendant to thirty years imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence.  Defendant objected and later filed a Motion to Reconsider Sentence, which the district court denied on August 30, 2022.  A few weeks later, a stay away order to protect Q.B. for the duration of Defendant's incarceration was issued and filed under seal.  The instant appeal followed.

### ASSIGNMENTS OF ERROR

Defendant alleges the following:

1. It was an abuse of discretion and error to deny Defendant's Motion for New Trial and for Post Verdict Judgment of Acquittal where the evidence was insufficient to support the verdict beyond a reasonable doubt.

2. The sentence imposed of thirty years at hard labor without benefits is unconstitutionally excessive.

---

[2] The defense objected at trial and in its Motion to Reconsider Sentence to the State's exhibits/letters from Defendant's ex-wife and niece being entered into the record under seal as they were not provided by a victim or family member as required under La. R.S. 46:1844.

## LAW AND DISCUSSION

### SUFFICIENCY OF THE EVIDENCE

Defendant argues that, where the allegation made against him was uncorroborated, and rested upon the testimony of a single witness who described an implausible criminal scenario, the evidence was insufficient, and the verdict of the jury was irrational and contrary to the due process of law.

The State contends that, based upon the law and evidence admitted at trial, it proved Defendant committed the crime of sexual battery of a juvenile under the age of thirteen beyond a reasonable doubt. Further, the State urges that it met the constitutional standard regarding the sufficiency of the evidence pursuant to *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The State also notes that corroboration of Q.B.'s testimony is not required. Further, "the jury found [her] account of sexual abuse by Bridgewater to be credible and her recounting of the incidents materially consistent" and the theory that Q.B.'s recollections of the abuse may have only been descriptions of, according to Defendant, a "fevered dream-nightmare," "defies credibility." Last, the trial court did not err in denying Defendant's motion for new trial and his motion for post verdict judgment of acquittal.

Sufficiency of the evidence is properly raised in the trial court by a motion for post verdict judgment of acquittal pursuant to La. C.Cr.P. art. 821. *State v. Ordonez*, 16-619 (La. App. 5 Cir. 3/15/17), 215 So.3d 473, 477. A post verdict judgment of acquittal shall be granted only if the court finds that the evidence, viewed in a light most favorable to the State, does not reasonably permit a finding of guilt. *State v. Durand*, 07-4 (La. App. 5 Cir. 6/26/07), 963 So.2d 1028, 1033, *writ denied*, 07-1545 (La. 1/25/08), 973 So.2d 753. An appellate review of the denial of the motion for post verdict judgment of acquittal is controlled by the

standards set forth in *Jackson v. Virginia*, *supra*. *See State v. Trice*, 14-636 (La. App. 5 Cir. 12/16/14), 167 So.3d 89, 92.

The constitutional standard for sufficiency of the evidence is whether, upon viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could find that the State proved all of the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, *supra*, *State v. Chinchilla*, 20-60 (La. App. 5 Cir. 12/23/20), 307 So.3d 1189, 1195, *writ denied,* 21-274 (La. 4/27/21), 314 So.3d 838.

In reviewing the sufficiency of the evidence, an appellate court must determine whether the evidence, direct or circumstantial or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime were proven beyond a reasonable doubt. *Jackson*, *supra*; *State v. Gonzalez*, 15-26 (La. App. 5 Cir. 8/25/15), 173 So.3d 1227, 1232. This directive that the evidence be viewed in the light most favorable to the prosecution requires the reviewing court to defer to the actual trier of fact's rational credibility calls, evidence weighing, and inference drawing. *State v. Clifton*, 17-538 (La. App. 5 Cir. 5/23/18), 248 So.3d 691, 702. This deference to the fact-finder does not permit a reviewing court to decide whether it believes a witness or whether the conviction is contrary to the weight of the evidence. *State v. McKinney*, 20-19 (La. App. 5 Cir. 11/4/20), 304 So.3d 1097, 1102. Further, a reviewing court errs by substituting its appreciation of the evidence and the credibility of witnesses for that of the fact-finder and overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. *State v. Lane*, 20-181 (La. App. 5 Cir. 1/27/21), 310 So.3d 794, 804. As a result, under the *Jackson* standard, a review of the record for sufficiency of the evidence does not require the reviewing court to determine whether the evidence at trial established guilt beyond a reasonable doubt, but

whether, upon review of the whole record, any rational trier of fact would have found guilt beyond a reasonable doubt. *Id.*

In its determination of whether any rational trier of fact would have found the defendant guilty, a reviewing court will not re-evaluate the credibility of witnesses or re-weigh the evidence. *Lane*, 310 So.3d at 804. The credibility of a witness, including the victim, is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. *State v. Gonzalez*, 15-26 (La. App. 5 Cir. 8/25/15), 173 So.3d 1227, 1233. Thus, in the absence of internal contradiction or irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient to support a conviction. *Lane*, *supra*.

The testimony of the victim alone can be sufficient to establish the elements of a sexual offense, even when the State does not introduce medical, scientific, or physical evidence to prove the commission of the offense. *Gonzalez*, 173 So.3d at 1232. It is presumed that the trier of fact considered discrepancies in testimony in assessing credibility and weight of testimony. *Id.*

Here, Defendant, born in 1986, was charged and convicted of sexual battery of a known juvenile (born in 2008) under the age of thirteen.

La. R.S. 14:43.1 provides in pertinent part:

> A. Sexual battery is the intentional touching of the anus or genitals of the victim by the offender using any instrumentality or any part of the body of the offender, directly or through clothing, or the touching of the anus or genitals of the offender by the victim using any instrumentality or any part of the body of the victim, directly or through clothing, when any of the following occur:
> [ . . . ]
>
> (2) The victim has not yet attained fifteen years of age and is at least three years younger than the offender.
>
> (3) The offender is seventeen years of age or older and any of the following exist:

(a) The act is without consent of the victim, and the victim is prevented from resisting the act because either of the following conditions exist:

[ . . . ]

(ii) The victim is incapable, through unsoundness of mind, of understanding the nature of the act, and the offender knew or should have known of the victim's incapacity.

At trial, Q.B. testified that she was fourteen years old and entering the ninth grade. She testified that she last saw Defendant four years earlier, and she and her siblings would have overnight visits at his house on Cleveland Place in Metairie. The last time Q.B. visited the home, she and her brother were having a sleepover and they fell asleep in her brother's room; she woke up and felt someone touching her between her legs and discovered, peering through squinted eyes (because she was pretending to be asleep), that Defendant was touching her. Q.B. recalled other instances where her father touched her in the Metairie home. She described other instances of abuse where Defendant touched her breasts, between her legs, and/or buttocks in the room she shared with her sisters and the "quiet room." She testified regarding an incident in the gym where her hands were bound above her head with toy handcuffs and her underwear and pants were removed. Q.B. stated the abuse started when she lived at the house on Vespasian Street when she was five or six years old -- she was playing a video game with her siblings when Defendant called her back to M.C.'s room, while M.C. was at school. She also remembered that there were other incidents where she was partially undressed because Defendant had removed her clothes, and one time where Defendant was trying to kiss her and she "[felt] his tongue in her mouth."

Further, Q.B.'s mother M.C. testified that Defendant was born in 1986 and Q.B. was born in 2008. She testified that the family moved to the house on

Vespasian Street in Algiers, Orleans Parish around the spring of 2012, a year and a half after her youngest children were born. M.C. and her children did not move until after Hurricane Ida, which made landfall in Louisiana on August 29, 2021. After M.C. and Defendant split, Defendant lived in Algiers and Gretna before moving to a house on Cleveland Place in Metairie, where he lived with his wife and their daughter. M.C. stated that she sent the children to visit Defendant up until the time of Q.B.'s disclosure in October 2018 because she wanted them to have relationships with their father.

Accordingly, we find Q.B.'s testimony that, several times over a period of approximately five years, Defendant touched her breasts, vaginal area, and buttocks, on top of and underneath her undergarments, was sufficient to convince a rational trier of fact, the jury, that Defendant was guilty of the charged offense of sexual battery beyond a reasonable doubt. Although Defendant cedes that Q.B.'s testimony is "substantially in agreement" with her account given in the forensic interview four years prior, he urges that the "story" is "hard-to-believe, wholly uncorroborated" and "implausibl[e]" and argues that the verdict should be set aside. But, again, in the case of sexual offenses, the testimony of the victim alone can be sufficient to establish the elements of a sexual offense, even where the State does not introduce medical, scientific or physical evidence to prove the commission of the offense. *State v. Dixon*, 07-915 (La. App. 5 Cir. 3/11/08), 982 So.2d 146, 153–54, *writ denied sub nom. State ex rel. Dixon v. State*, 08-987 (La. 1/30/09), 999 So.2d 745.

Defendant also points to "the many gaps in [Q.B.'s] memory" to support his claims challenging the sufficiency of the evidence adduced by the State. However, the judgment of witness credibility is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. *Id.* at 153; *State v. Simms,* 03-1459 (La. App. 5 Cir. 12/28/04), 892 So.2d 111, 121.

Where conflicting testimony produces an issue of material fact that requires for its resolution the determination of witness credibility, the trier of fact's resolution is a matter of weight, not sufficiency, of the evidence. *Dixon*, 982 So.2d at 153. In this case, there is no physical evidence. The State's expert witness in child abuse pediatrics, Dr. Mehta, explained that she would expect to find little physical evidence if the exam occurred more than 72 hours after the last incidence of abuse, like in the instant case. Dr. Mehta also discussed disclosure being "a process" and children not always having the language to explain what is happening to them. Moreover, this Court has recognized that memory lapse and alleged inconsistencies may have resulted from the victim's tender age — Q.B. was five years old —when the abuse began; the traumatic nature of the experience; exposure to unfamiliar surroundings; or the method of interrogation. *See State v. Simmons*, 03-20 (La. App. 5 Cir. 4/29/03), 845 So.2d 1249, 1258 *citing State v. Foy,* 439 So.2d 433, 434 (La. 1983).

Considering the law and evidence, we find that that a rational trier of fact viewing the evidence in a light most favorable to the prosecution, could have found beyond a reasonable doubt that the evidence was sufficient under the standard set forth in *Jackson* to support Defendant's conviction. Hence, the district court did not err in denying Defendant's Motions for New Trial and for Post Verdict Judgment of Acquittal.

*EXCESSIVE SENTENCE*

Defendant argues that a sentence of thirty years at hard labor is unconstitutionally excessive, and shocking to the conscience, in this case where the accused is a first offender and where the crime of conviction was premised largely on through-the-clothing touching which, while illegal, is on the lower end of the scale of the proscribed criminal conduct. Defendant further argues that even the minimum sentence to be imposed for the crime committed, twenty-five years,

would be excessive and cruel and unusual punishment, contrary to the State and federal constitutions.

The State counters that the record fully supports the sentence imposed and the trial court did not abuse its broad sentencing discretion.

When imposing sentences, a trial court has vast discretion in imposing a sentence within statutory limits. *State v. Dixon*, 18-79 (La. App. 5 Cir. 8/29/18), 254 So.3d 828, 836, *writ not considered,* 18-1909 (La. 2/18/19), 263 So.3d 1154, and *writ denied,* 18-1909 (La. 4/8/19), 267 So.3d 606 *citing State v. Williams*, 03-3514 (La. 12/13/04), 893 So.2d 7, 16-17. However, there is no requirement that specific matters be given any particular weight at sentencing. *State v. McGowan*, 16-130 (La. App. 5 Cir. 8/10/16), 199 So.3d 1156, 1163, *writ not considered sub nom. State ex rel. McGowan v. State*, 17-1675 (La. 10/27/17), 228 So.3d 1227.

The Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. *Id.* at 1162. A sentence is considered excessive, even if it is within the statutory limits, if it is grossly disproportionate to the offense or imposes needless and purposeless pain and suffering. *Id.* In reviewing a sentence for excessiveness, the appellate court must consider the punishment and the crime in light of the harm to society and gauge whether the penalty is disproportionate as to shock the court's sense of justice. *State v. Diaz*, 20-381 (La. App. 5 Cir. 11/17/21), 331 So.3d 500, 519, *writ denied*, 21-1967 (La. 4/5/22), 335 So.3d 836. An appellate court cannot set aside a sentence as excessive absent a manifest abuse of discretion. *See Williams*, 893 So.2d at 16.

In determining whether a sentence is excessive, an appellate court considers: (1) the nature of the crime; (2) the nature and background of the offender; and (3) the sentences imposed for similar crimes by the same and other courts. *State v. Dixon*, 18-79 (La. App. 5 Cir. 8/29/18), 254 So.3d 828, 837, *writ not considered,*

18-1909 (La. 2/18/19), 263 So.3d 1154, and *writ denied,* 18-1909 (La. 4/8/19), 267 So.3d 606. On appeal, the issue is not whether a different sentence might have been more appropriate, but whether the trial court abused its vast discretion. *Id.; Dixon*, 254 So.3d at 836-37.

La. R.S. 14:43.1 provides, in pertinent part:

> C. (2) Whoever commits the crime of sexual battery on a victim under the age of thirteen years when the offender is seventeen years of age or older shall be punished by imprisonment at hard labor for not less than twenty-five years nor more than ninety-nine years. At least twenty-five years of the sentence imposed shall be served without benefit of parole, probation, or suspension of sentence.

Defendant was sentenced to thirty years imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence for the charge of sexual battery of a juvenile under the age of thirteen years. Defendant argues that he "is a first [time] offender and where the crime of conviction was premised largely on through-the-clothing touching which, while illegal, is on the lower end of the scale of the proscribed criminal conduct." Accordingly, Defendant's sentence is at the lower end of the sentencing range and less than a third of the maximum sentence he could have received.

Before imposing Defendant's sentence, the judge advised Defendant that he read the victim impact statements from Q.B. and her mother. He also read two other statements made on behalf on Q.B., Defendant's statement, and the five letters that his family members sent on his behalf. The district court noted that Defendant helped care for his father who suffered with dementia. However, pursuant to La. C.Cr.P. art. 894.1, the judge also highlighted his consideration of the following: the offender's conduct during the commission manifested deliberate cruelty to the victim; the offender knew or should have known that the victim of the offense was particularly vulnerable or incapable of resistance due to extreme

youth; the offender used his or her position or status to facilitate the commission of the offense; and the offense resulted in significant mental and probably permanent injury to his daughter, the victim in this case. Defendant touched Q.B. inappropriately and exploited his position as her father to gain access to her during periods when he was supposed to be caring for and visiting with Q.B. and her siblings. He also instructed her not to tell her mother about the abuse, or otherwise seek help. Defendant knew Q.B., his biological daughter, was vulnerable due to her young age when the abuse began and took advantage of her lack of protective capacity, inability to resist, and he overpowered her at times during the abuse. Last, as a result of the abuse, Q.B. was afraid – afraid that her mother would blame her for the abuse, afraid that her mother and siblings would see her differently, and afraid of being hurt again. Before her disclosure, she became quiet and stopped doing her favorite things. Q.B.'s victim impact statement described suffering from a negative self-image and having suicidal thoughts. Q.B. also testified about therapy she received and coping mechanisms she learned to use to deal with the memories of the abuse.

Upon sentencing Defendant, the district court also drew attention to La. C.Cr.P. art. 894(A)(3) and its directive that the court should impose a (particular) sentence of imprisonment if "a lesser sentence would deprecate the seriousness of [his] crime." Further, similar or harsher sentences have been imposed for similar crimes by this Court and other courts and have been found to not be constitutionally excessive. In support of its position, the State cites to *State v. Howard*, 18-159 (La. App. 5 Cir. 11/7/18), 259 So.3d 583, *writ denied*, 18-2034 (La. 4/29/19), 268 So.3d 1031. In *Howard*, the defendant was convicted of indecent behavior with a juvenile under the age of thirteen (count one) and sexual battery of a juvenile under the age of thirteen (count two). As to count two, the defendant was sentenced to forty years at hard labor, without the benefit of parole,

probation, or suspension of sentence. This court declared that the fact that the defendant accomplished his crimes without the use of weapons did not negate the fact that his ability to overpower his victims was made possible through his superior height, weight, and strength. The defendant also had a position as a trusted authority figure within the home, which he exploited to commit his crimes.

The State also cites to *State v. Lilly*, 12-8 (La. App. 1 Cir. 9/21/12), 111 So.3d 45, *writ denied*, 12-2277 (La. 5/31/13), 118 So.3d 386. In *Lilly*, the defendant was convicted of sexual battery in violation of La. R.S. 14:43.1(C)(2) and was sentenced to thirty-five years at hard labor. The victim was four years old at the time of the incident. On appeal, the defendant argued that the sentence was excessive for a fifty-seven-year-old first-felony offender where the State, at most, proved a fingertip touching of the victim's vaginal area. The appellate court upheld the sentence, noting that the victim's age made her particularly vulnerable and that the defendant was in a position of trust as her babysitter. *Id*. at 49-50, 63-64.

In *State v. Brenckle*, 14-883 (La. App. 5 Cir. 5/14/15), 170 So.3d 1141, 1155-56, the defendant was convicted of the sexual battery of two young children, a boy and a girl. The trial court considered La. C.Cr.P. art. 894.1, in addition to two victim impact statements presented prior to sentencing before it imposed two concurrent forty-year sentences. This Court found that those sentences were not constitutionally excessive, noting that they were less than half the maximum sentences that could have been imposed.

Last, the jurisprudence indicates that maximum, or nearly maximum terms of imprisonment may not be excessive when the defendant has exploited a position of trust to commit sexual battery or indecent behavior with a juvenile. *State v. Badeaux*, 01-406 (La. App. 5 Cir. 9/25/01), 798 So.2d 234, 239, *writ denied,* 01-2965 (La. 10/14/02), 827 So.2d 414. Considering the nature of the crime, the position of trust Defendant held as the victim's biological father, the ages of the

victim when the abuse occurred, and her lack of protective capacity, we find that the record supports the sentence imposed and the district court did not abuse its wide discretion in imposing a thirty-year sentence in this case. Further, we find Defendant's sentence, which is at the lower end of the statutorily prescribed range, is not constitutionally excessive.

## *ERRORS PATENT*

The record was reviewed for errors patent, pursuant to La. C.Cr.P. art. 920; *State v. Oliveaux*, 312 So.2d 337 (La. 1975); and *State v. Weiland*, 556 So.2d 175 (La. App. 5th Cir. 1990).

The Louisiana Uniform Commitment Order (UCO) incorrectly reflects the dates of the offenses on counts one and two as January 18, 2013. However, the record reflects that counts one and two occurred on or between January 18, 2013 and October 10, 2018. To ensure accuracy in the record, we remand this matter for the district court to correct the UCO to reflect the entire date range of the offense. Further, we direct the Clerk of Court for the 24th Judicial District Court to transmit the corrected UCO to the appropriate authorities, including the Department of Corrections' legal department, in accordance with La. C.Cr.P. art. 892(B)(2). *See Lane*, *supra* (remanding the case with instructions to the trial court to correct the UCO to include the entire date range of the offenses as to counts one and two).

## *DECREE*

Considering the foregoing, Defendant's conviction and sentence are affirmed. The matter is remanded for further proceedings consistent with this opinion.

**AFFIRMED;
REMANDED FOR CORRECTION OF THE UCO**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
CORNELIUS E. REGAN, PRO TEM

JUDGES



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **APRIL 26, 2023** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

**22-KA-517**

**E-NOTIFIED**
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE R. CHRISTOPHER COX, III (DISTRICT JUDGE)
ANDREA F. LONG (APPELLEE)                    THOMAS J. BUTLER (APPELLEE)

**MAILED**
BRUCE G. WHITTAKER (APPELLANT)              HONORABLE PAUL D. CONNICK, JR.
ATTORNEY AT LAW                             (APPELLEE)
LOUISIANA APPELLATE PROJECT                 DISTRICT ATTORNEY
POST OFFICE BOX 791368                      LAURA S. SCHNEIDAU (APPELLEE)
NEW ORLEANS, LA 70179                       ZACHARY L. GRATE (APPELLEE)
                                            ASSISTANT DISTRICT ATTORNEYS
                                            TWENTY-FOURTH JUDICIAL DISTRICT
                                            200 DERBIGNY STREET
                                            GRETNA, LA 70053